THE STATE OF OHIO, APPELLEE, *v.* TENACE, APPELLANT.

[Cite as *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417.]

(No. 2003–1429—Submitted September 20, 2005—Decided May 31, 2006.)

LANZINGER, J.

{¶ 1} On January 28, 1994, in response to a call from a neighbor, Chester Kozlowski went to the home of his brother, Edward, on Wamba Street in Toledo and found Edward's body lying on the floor. Defendant-appellant, Troy Tenace, was arrested several days later and was charged with aggravated murder during an aggravated robbery of 76–year–old Edward Kozlowski. Tenace was found guilty of murdering Kozlowski and was sentenced to death, but his conviction was reversed on appeal. Tenace was retried and was again found guilty of murdering Kozlowski, and he was sentenced to death. The court of appeals then affirmed his conviction and death sentence.

{¶ 2} In this appeal, Tenace has raised 17 propositions of law. We have reviewed each and have determined that none justifies reversal of Tenace's conviction for aggravated murder.[1] Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstance against the mitigating evidence and have compared Tenace's sentence to those imposed in similar cases. We find that the aggravating circumstance does not outweigh mitigation beyond a reasonable doubt. Therefore, we reverse Tenace's sentence of death.

{¶ 3} *Prosecution evidence.* On Christmas Eve 1993, Tenace arrived from New York at the home of Lori Moore in Toledo. Moore had known Tenace since 1991, when he worked construction and handyman jobs with Moore's daughter's boyfriend. Because Tenace had no place to stay and all of the local shelters were full, Moore allowed Tenace to stay at her home. During the next several weeks, Tenace continued to stay at Moore's home. According to Moore, Tenace would

---

1. On April 14, 2005, Tenace filed a motion pro se entitled "Waiver of All Further Appeals" in which he requested that review of all pending appeals, both state and federal, cease. He indicated no dissatisfaction with current counsel. Because we have decided this appeal on its merits, his motion is moot.

go to the public library, get lists from the local directories, and make phone calls soliciting work for concrete and household repair.

{¶ 4} During January 1994, Marlene Murphy, who also lived at Moore's home, would borrow Moore's car to run errands. Because Tenace was not permitted to drive Moore's car, Murphy drove Tenace to buy supplies and to places where he worked. On one occasion, Murphy took Tenace to a house on Wamba Street in Toledo, where Tenace had done some chimney work.

{¶ 5} In late January 1994, Ben Lamont Covington, who lived at Moore's house with Moore's daughter, drove Tenace to Wamba Street in Moore's car. Before taking Tenace there, Covington overheard Tenace say that he was going to reimburse a customer who had overpaid him. Moore had seen Tenace at the same time and described him as being "high." According to Moore, Tenace had called a customer to tell him that he had overpaid. Tenace left Moore's home that evening wearing heavy work boots.

{¶ 6} As Covington drove Tenace to Wamba Street, it was "snowing like crazy." Covington dropped Tenace off at the Wamba Street address and told him he was going to a nearby store. A short time later, while inside the store, Covington saw Tenace get in Moore's car and beckon to Covington. Tenace then told Covington that he "took care of business," and they drove off.

{¶ 7} While riding back to Moore's, Tenace opened the car window and said he was hot, and he asked Covington to stop the car because he had to vomit. Tenace left the car. After a few minutes, Tenace returned, and they drove back to Moore's home. There, Tenace gave Covington $20.

{¶ 8} Lois Hamilton, who lived next door to Edward Kozlowski, did not see Kozlowski on January 26 and noticed that Kozlowski did not undertake his usual morning routine on Thursday, January 27. Hamilton knew Kozlowski was at home because his car was parked in the garage. The next morning, however, Hamilton became concerned because she had seen a light on in Kozlowski's living room around 4:30 a.m. and noticed that it was still on around dawn. Hamilton summoned Kozlowski's brother, Chester, because she suspected that something was wrong.

{¶ 9} After receiving Hamilton's call, Chester Kozlowski went to his brother's home. Once inside, Chester found his brother lying between the living room and dining room in a pool of blood. The phone cord had been ripped out of the wall, so Chester asked Hamilton to call police.

{¶ 10} Toledo police arrived and found cloth wrapped around Kozlowski's head, covering his mouth. Officer James Knight described Kozlowski's face as "beaten" with "severe damage."

{¶ 11} The deputy coroner who performed the autopsy on Kozlowski found what appeared to be a shirt wrapped around his face with a knot in his mouth in gag form. Kozlowski had sustained blunt-force injuries to his face and neck, including fractures to the bridge of his nose and skull fractures, as well as three broken ribs.

{¶ 12} Internally, Kozlowski sustained "quite a few injuries of the neck." The horns of the thyroid cartilage were fractured, indicating a squeezing-type pressure from both sides of the neck. There was also a hairline fracture of the left side of the hyoid bone. But the gag on his mouth did not cause Kozlowski to suffocate. The nature of Kozlowski's injuries indicated manual strangulation. The coroner concluded that Kozlowski had incurred a combined cause of death: blunt craniocerebral trauma and strangulation.

{¶ 13} In the days following his trip to Wamba Street, Tenace began making a number of calls to New York, saying that he had to get out of town. Tenace told Moore that he needed money to get out of town and acted "agitated, walking around the house saying, 'He must have choked on a gag.'" Tenace asked Covington to lend him money. When Covington told Tenace he could not, Tenace told him, "You don't understand. I need it. I just killed a mother fucker. * * * I don't know if he's dead. I just stomped on his head a couple times and he wasn't moving, but I don't know if he's dead." Tenace admitted to Covington that the incident happened at the house to which Covington had driven him several days earlier. During this time, Moore also heard Tenace say, "I think I killed him. * * * He must have choked on the gag."

{¶ 14} Covington and others living at Moore's house discussed what Tenace had said and began looking for news of a murder on television. When the news reported the discovery of Kozlowski's body, Tenace, who was also there at the time, "dropped his head and * * * said he was sorry and that he didn't want to hear no more of that shit" and left the room. Sometime thereafter, Murphy heard Tenace say, "There's not enough evidence. They can't pin this on anybody."

{¶ 15} Fearing for her life, over the weekend, Moore made many attempts to reach authorities to remove Tenace from her home. On the following Monday, January 31, Thomas Ross, then a Toledo police investigator, returned Moore's phone call and met her away from her home. At that time, Moore gave Ross a sheet of paper that Tenace had given her. On one side of the paper was a code to be given to Western Union that Moore was to use to obtain money for Tenace. On the other side was the Xerox copy of a page from a city journal of addresses. The name Helen Kozlowski, her address on Wamba Street, and her phone number had been circled in green ink.

{¶ 16} Police arrested Tenace at Moore's home, and at the police station, Detective Ross advised Tenace of his *Miranda* rights. Tenace waived those rights after stating that he was not under the influence of alcohol or drugs. After signing a waiver-of-rights form, Tenace told police that he had found Kozlowski's name and phone number in a street guide. Tenace stated that he had circled Kozlowski's address on the street-guide page because Kozlowski had agreed to have work done to his chimney.

{¶ 17} When Detective Ross asked Tenace what happened at Wamba Street during the last week of January 1994, Tenace became very upset. Tenace said that he had been awake for several days, drinking beer and doing crack and that he had needed more crack. Tenace stated that someone drove him to Kozlowski's home and that he had asked Kozlowski for change. Tenace claimed that Kozlowski was talking so loudly that he feared the neighbors might become alarmed, so he placed a gag around Kozlowski's face. Tenace said that he grabbed money out of Kozlowski's pocket and ran.

{¶ 18} While the interview continued, Tenace was "full of despair, crying" and said he wished he could die. Tenace was rambling so much that Detective Ross gave him a few minutes to settle down, and he then asked Tenace whether he would agree to be taped. Ross then audiotaped his interview with Tenace, and Tenace admitted that he had wrestled with Kozlowski on the floor of Kozlowski's home and had tied a gag around his mouth. Tenace had asked Kozlowski whether he had more money, and Kozlowski pointed to the other room. Tenace opened a drawer and took "[a] couple hundred" dollars and pulled the phone cord out of the wall "so he couldn't call anybody." Tenace then fled the scene.

{¶ 19} *Trial result.* The grand jury indicted Tenace on one count of aggravated murder for the killing of Kozlowski (R.C. 2903.01(B)), with a death-penalty specification for murder during an aggravated robbery. See R.C. 2929.04(A)(7). The grand jury also indicted Tenace for aggravated robbery pursuant to R.C. 2911.01(A)(2).

{¶ 20} A jury convicted Tenace on both counts and recommended a death sentence. Upon appeal, the court of appeals reversed. The appellate court found that Tenace was denied the effective assistance of counsel when the trial court allowed counsel to withdraw Tenace's plea of not guilty by reason of insanity, even though Tenace had objected. *State v. Tenace* (1997), 121 Ohio App.3d 702, 715, 700 N.E.2d 899.

{¶ 21} On remand, the cause was retried, and another jury found Tenace guilty as charged.

{¶ 22} At the mitigation hearing, Tenace presented several mitigation witnesses, including his mother, a videotaped deposition of his brother, and an

expert psychologist. However, the jury recommended death, and the court imposed the death penalty on Tenace.

{¶ 23} On appeal, the court of appeals affirmed the convictions and death sentence. The cause is now before us on an appeal as of right, pursuant to R.C. 2929.05(A) and Section 2(B)(2)(c), Article IV of the Ohio Constitution.

Voir Dire/Pretrial Issues

*Excusal for Cause (VII)*

{¶ 24} In proposition of law VII, Tenace argues that the trial court erroneously excluded prospective juror Vitale from the venire solely on the grounds that she is the sister of one of Tenace's attorneys. Tenace submits that a trial court may not add to the categories of presumptively prejudiced jurors set forth in Crim.R. 24 and exclude them for cause.

{¶ 25} The excusal of prospective juror Vitale did not constitute error. As we held in *State v. Sanders* (2001), 92 Ohio St.3d 245, 249, 750 N.E.2d 90, "an erroneous excusal for cause, on grounds other than the venireman's views on capital punishment, is not cognizable error, since a party has no right to have any particular person sit on the jury. Unlike the erroneous denial of a challenge for cause, an erroneous excusal cannot cause the seating of a biased juror and therefore does not taint the jury's impartiality." Accord *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 39.

{¶ 26} Moreover, excusing juror Vitale was within the trial court's discretion under CrimR. 24(C), which provides:

{¶ 27} "A person called as a juror may be challenged for the following causes:

{¶ 28} "* * *

{¶ 29} "(14) That the juror is otherwise unsuitable for any other cause to serve as a juror."

{¶ 30} See, also, R.C. 2313.42(G) (a prospective juror may be properly excused for cause if the juror is "akin by consanguinity or affinity within the fourth degree * * * to the attorney of either party").

{¶ 31} Proposition VII is not well taken.

*Voluntariness of Confession (VIII)*

{¶ 32} In proposition of law VIII, Tenace contends that a confession made to police when a defendant is not informed that he faces the death penalty is involuntary and violates his rights to counsel and to be free from self-incrimination.

{¶ 33} Yet as Tenace concedes, we have held that police are not required to inform a suspect that he or she is "potentially eligible for a death sentence prior

to obtaining a valid waiver of the right to counsel." *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623. Accord *State v. Sheppard* (1998), 84 Ohio St.3d 230, 235, 703 N.E.2d 286. Accordingly, proposition VIII is summarily overruled.

## Trial Issues

### Sufficiency of the Evidence [Specific Intent] (II)

### Manifest Weight of the Evidence (III)

{¶ 34} In proposition of law II, Tenace asserts that the evidence at trial was insufficient to prove intent to kill and that therefore his conviction and sentence for aggravated murder must be reversed. Tenace submits that the trial court erred in not granting his Crim.R. 29(A) motion for acquittal.

{¶ 35} In proposition of law III, Tenace asserts that because the state failed to prove the element of intent to kill, his conviction was against the manifest weight of the evidence.

{¶ 36} In criminal appeals from the court of appeals, this court is not required to reweigh evidence. See *State v. Smith* (1997), 80 Ohio St.3d 89, 102, 684 N.E.2d 668, fn. 4. While pursuant to R.C. 2953.02 we can overturn a conviction as being against the manifest weight of the evidence in a capital case, we consider such claims only when the crime was committed after January 1, 1995. *State v. Sanders* (2001), 92 Ohio St.3d 245, 254, 750 N.E.2d 90; *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 134. Because the crime committed here occurred before 1995, we will not decide Tenace's weight-of-the-evidence arguments. Nevertheless, as we did in *Sanders* and *Skatzes,* we will consider Tenace's arguments as if he were challenging the sufficiency of the evidence.

{¶ 37} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence. See *State v. Carter* (1995), 72 Ohio St.3d 545, 553, 651 N.E.2d 965; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 38} The state's evidence showed that Tenace told both Moore and Covington that he needed money to get out of town. After Covington told Tenace that he

could not give him any money, Tenace declared: "I need it. I just killed a mother fucker. * * * I just stomped on his head a couple times and he wasn't moving, but I don't know if he's dead." Lori Moore described Tenace as "agitated," and Marlene Murphy described Tenace as "jittery and jumping" after he returned to Moore's home with Covington from Wamba Street.

{¶ 39} Dr. Cynthia Beisser, who performed the autopsy on Kozlowski, stated that the nature of the injuries to Kozlowski's neck indicated a squeezing-type pressure from both sides of the neck, and she testified that he was a victim of manual strangulation. She further noted that her external findings showed quite a bit of trauma on Kozlowski's face and neck area, including bruises, abrasions, and lacerations caused by blunt-force trauma. Several areas of Kozlowski's head and neck sustained fractures, including the bridge of his nose, the sphenoid bone, the roof of the sphenoid sinus, the horns of the thyroid cartilage, and the left side of the hyoid bone. Kozlowski also had subarachnoid blood over the left side of his brain, and he sustained three broken ribs. Dr. Beisser concluded that Kozlowski had died as a result of blunt craniocerebral trauma and strangulation.

{¶ 40} Tenace argues that the foregoing did not constitute a "savage beating" or "massive damage" to Kozlowski and that Dr. Beisser's testimony talked only about "hairline fractures, brittle bones, and no evidence of stomping." Tenace also submits that questions from the jury during deliberation indicate that the jury struggled with the issues of purpose and specific intent. Tenace points out that even the trial judge expressed concern over the jury's possible confusion.

{¶ 41} Nevertheless, construed in a light most favorable to the state, the evidence was sufficient to support the jury's verdict beyond a reasonable doubt on the element of specific intent to kill. A jury could reasonably find that Tenace specifically intended to kill Kozlowski in the course of aggravated robbery, given the evidence of manual strangulation and multiple blunt-force injuries to Kozlowski's head. As we noted in another capital case, an intent to kill is shown by a defendant's blows to the victim's "head, certainly a vital area." *State v. Phillips* (1995), 74 Ohio St.3d 72, 82, 656 N.E.2d 643. That the 76–year–old Kozlowski had brittle bones, or that some of the fractures he sustained were hairline, does not detract from the evidence showing Tenace's intent to kill.

{¶ 42} Accordingly, we reject propositions II and III.

### Sentencing Issues

#### *Sufficiency of the Evidence (I)*

{¶ 43} In proposition of law I, Tenace argues that the evidence was insufficient to find that the aggravating circumstance outweighed the factors in mitigation beyond a reasonable doubt and that therefore his death sentence was inappropri-

ate. We will consider Tenace's arguments as part of our independent review of the sentence.

### Proportionality Review (XVII)

{¶ 44} In proposition of law XVII, Tenace contends that his sentence is disproportionate to the sentence in other cases involving murder in connection with aggravated robbery. Yet many of the arguments that Tenace raises under this proposition claiming a disproportionate sentence are the same ones he raises claiming that the evidence was insufficient to find that the aggravating circumstance outweighed the mitigating factors. Accordingly, we will also consider Tenace's arguments under this proposition as part of our independent review.

### Prosecutorial Misconduct

{¶ 45} In proposition of law IV, Tenace alleges that prosecutorial misconduct occurred throughout his trial. However, determining whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and (2), if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749.

{¶ 46} Tenace first contends that the prosecutor misstated the evidence and made outlandish remarks by promising to provide a connection between the extent of the injury to the victim and defendant's intent to kill. Tenace cites the prosecutor's language during opening statement of the guilt phase that characterized Kozlowski's injuries as "massive damage" due to a "savage beating * * * inflicted on this person * * * to cause his death."

{¶ 47} Yet even if Tenace had objected, error or prejudice is lacking. The prosecutor's comment that Kozlowski suffered "massive damage" constituted fair comment. The prosecutor is allowed to foreshadow what the evidence is and what he believes the evidence will establish. The terms the prosecutor used were a fair summary of the evidence later elicited from Dr. Beisser. Tenace points to testimony that Dr. Beisser gave on cross-examination that several of the facial fractures Kozlowski sustained required little physical force to occur. But Dr. Beisser stated that Kozlowski suffered "quite a bit of trauma" externally and "quite a few injuries of the neck" internally. Quantitatively, "massive damage" was an appropriate term to describe what the evidence did in fact show, as testified to by Dr. Beisser. The fact that the force that caused certain injuries

was not intense did not mean that the prosecutor's comment was an exaggeration or improper.

{¶ 48} Nor was "savage beating * * * inflicted * * * to cause his death" an improper description in opening statement. Dr. Beisser concluded that these injuries caused the victim's death, and a jury may certainly find intent to kill from the nature of the injuries that Tenace inflicted upon this 76–year–old man, as well as the surrounding facts and circumstances. See, e.g., *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293. Moreover, the trial court instructed the jury that opening statements are not evidence. See *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 226, 744 N.E.2d 163.

{¶ 49} Tenace next claims that the prosecutor improperly stated during closing argument at the guilt phase that Tenace had left the victim to die. Tenace's failure to object waived all but plain error. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 451, 696 N.E.2d 1009. Moreover, error is absent in any event. The prosecutor may comment on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *Lott*, 51 Ohio St.3d at 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773. The facts show that Tenace did leave Kozlowski after beating and robbing him and that Kozlowski then died.

{¶ 50} Next, Tenace complains that the prosecutor improperly asserted in closing argument that the defendant had "stomped" the victim. Regardless of the fact that Tenace failed to object, such a comment was not improper. Tenace told Covington that he thought the victim was dead "because he stomped in his head a couple of times and he wasn't moving when he left." The prosecutor fairly commented on the evidence and simply reiterated the characterization that Tenace himself relayed to Covington. The fact that Dr. Beisser testified on cross-examination that there was no evidence of stomping on Kozlowski's neck did not necessarily conflict with Covington's testimony.

{¶ 51} Tenace next cites as improper the prosecutor's comment, without evidence to support it, that Tenace had a plan to eliminate the victim. Once again, Tenace's failure to object waived all but plain error. Moreover, the statement was a fair comment based on a reasonable inference that could be drawn from the evidence. Tenace knew that Kozlowski had paid him in cash before, so he reasoned that it was likely that Kozlowski had cash at his home. Tenace also knew that Kozlowski was elderly and that Kozlowski could identify him. Based on this evidence, the prosecutor could argue, and the jury could reasonably infer, that Tenace had planned to rob and kill Kozlowski before going to Kozlowski's home that evening.

{¶ 52} Tenace next claims improper comment during guilt-phase closing argument that Kozlowski suffered "massive injury." Again, Tenace did not object,

and the comment did not constitute error. This comment was fair based on the testimony of Dr. Beisser in view of the fact that Kozlowski's injuries had caused his death.

{¶ 53} Tenace also cites as improper the prosecutor's rebuttal argument at the close of the guilt phase. The prosecutor stated: "Now, we don't know what happened in that house on that evening. Only the killer would actually know that. And we know what Troy Tenace told the police on that—the 31st. But I submit to you that he entered the house, as a possible scenario, he demanded the money from Mr. Kozlowski. Mr. Kozlowski said no, I'm not giving you my money, and he said, Get out or I'm going to call the police. He goes over to pick up the phone. That's when the phone cord is pulled out. He said he didn't want him making noise so it would attract attention from the neighbors. He certainly didn't want him to pick up the phone and leave there."

{¶ 54} Tenace did not object to these comments, but none of them constituted error. These were all fair comments based on reasonable inferences that could be drawn from the evidence.

{¶ 55} Next, Tenace complains that the prosecutor improperly told jurors during voir dire that death was a mandatory sentence under some circumstances. He claims further improper comment when the prosecutor stated at the close of the mitigation phase: "Your verdict will be mandatory, and that is that you must vote for the death sentence." Tenace asserts that the trial judge made the same mandatory-death comment to two prospective jurors who did not serve on the jury.

{¶ 56} Defense counsel never objected to any of these comments. Yet even if they had been objected to, error is absent. The prosecutor prefaced his comment during voir dire by explaining that if the jury finds that the aggravating circumstance outweighs the mitigating factors, a death sentence is mandatory. The trial judge gave one prospective juror a hypothetical: "The law says that if A, B, and C exists, you must impose the death penalty. You have no choice. It's mandatory. The law says you must." The judge told the other prospective juror: "as a matter of fact in certain circumstances the death penalty is mandatory."

{¶ 57} Ohio law directs that the jury "shall recommend to the court that the sentence of death be imposed on the offender" when the jury unanimously finds beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. R.C. 2929.03(D)(2). Thus, given the context and manner in which the comments were delivered, the comments were not improper.

{¶ 58} Lastly, Tenace contends that the cumulative effect of the prosecutorial comments cited by him denied him a fair trial. Since the prosecutor's comments

were either fair comments or nonprejudicial, no basis exists for us to find cumulative error. Accordingly, we overrule proposition IV.

### Effective Assistance

{¶ 59} In proposition of law V, Tenace contends that trial counsel rendered ineffective assistance in failing to object to improper and prejudicial statements by the prosecutor. Before we reverse a conviction for ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 60} However, in no instance does Tenace demonstrate deficient performance or prejudice—in other words, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id., paragraph three of the syllabus.

{¶ 61} Tenace first argues that counsel failed to object when the state promised to connect the extent of the injuries to the victim with defendant's intent to kill through the coroner's testimony. Yet as we discussed under proposition IV, the prosecutorial comments were not improper in the context in which they were made. Moreover, defense counsel cannot be found deficient in not objecting to comments about evidence that the state has yet to present.

{¶ 62} Tenace then asserts that counsel were deficient in failing to object to other instances that he claims constituted prosecutorial misconduct. However, " '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.' " *State v. Fears* (1999), 86 Ohio St.3d 329, 347, 715 N.E.2d 136, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. Moreover, as we discussed in proposition IV, the prosecutorial comments that Tenace complains of were proper, and therefore counsel did not render ineffective assistance in not objecting to these comments.

{¶ 63} Tenace also claims that counsel were deficient in failing to propose jury instructions that placed the burden of proving the mitigating factors by a preponderance of the evidence on the state. However, we have held that requiring an accused to establish mitigating factors, even by a preponderance, remains constitutionally valid. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 15–16, 564 N.E.2d 408. Therefore, counsel were not deficient in failing to propose different jury instructions in this regard.

{¶ 64} Lastly, Tenace submits that the cumulative effect of counsel's mistakes violated his right to effective assistance of counsel. However, Tenace received a fair trial, and we hold that all of the instances cited by him either did not

constitute deficient performance or did not affect the outcome of his trial. Therefore, we overrule proposition V.

## Constitutionality

{¶ 65} In proposition VI, Tenace argues that Ohio's death-penalty scheme violates international law, and he contends that trial counsel were deficient in failing to argue that his rights were violated under international law. However, we have uniformly rejected such claims. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643; *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904. Thus, counsel's failure to raise such claims did not constitute ineffective assistance.

{¶ 66} In propositions of law IX, X, XI, XII, XIII, XIV, XV, and XVI, Tenace challenges Ohio's death-penalty statutes on numerous constitutional grounds, but we summarily reject these claims. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Buell* (1986), 22 Ohio St.3d 124, 137–138, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 509 N.E.2d 383; *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596; *State v. Mills* (1992), 62 Ohio St.3d 357, 372, 582 N.E.2d 972; and *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## Independent Review and Proportionality

### *Aggravating Circumstance*

{¶ 67} Upon independent assessment, we find that the evidence proves beyond a reasonable doubt the aggravating circumstance in this case: that Tenace murdered Edward Kozlowski while committing an aggravated robbery.

### *Mitigating Evidence*

{¶ 68} In proposition of law I, Tenace contends that the evidence was insufficient to support the finding that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt.

{¶ 69} At the mitigation hearing, Tenace presented four witnesses.

{¶ 70} Tammy Bruno, Tenace's sister, testified during the mitigation phase of Tenace's first capital trial in November 1994. However, because she was in prison at the time of Tenace's second trial, her prior testimony was read to the jury. In that testimony, Bruno described her childhood as "very bad." She was "sexually abused by [her] father * * * from the time [she] was two until [she] was about 17, and he [Tenace] was made to watch * * *." The family never celebrated any holidays or birthdays, and Bruno stated that she and her brothers

would cook their own meals "because [her] mother was either sleeping or she was out at night."

{¶ 71} Bruno described her life prior to her marriage to a New York state trooper as "[v]ery, very bad. Psycho kind of bad." As children, she and her brothers thought their lives were normal. Their parents, who divorced when the children were very young, would steal the children from each other. Bruno elaborated on the fact that Tenace was always present when Bruno was sexually abused as a child. Tenace would be in his own bed in the same room and would be told to go to sleep or be made to stand there and watch "as [her] stepfather would make [her] do things." She testified, "We had race horses, and he would make me do things to the horses and he would make [Tenace] stand there and watch * * *." Bruno also recounted that Tenace had told her that their mother would leave him with a baby-sitter who sexually abused him. Tenace would beg his mother not to leave him there, but she would ignore his pleas.

{¶ 72} Bruno declared, "We've never had a normal family, ever," and she said that Tenace had never had a normal life. Bruno felt that if Tenace's life were spared, he would adjust well to prison life and that his son would be able to see him. According to Bruno, all Tenace has ever known are "abnormal things."

{¶ 73} Tenace's brother, Tony Tenace, testified by way of a videotaped deposition. Tony is a year older than Tenace and was incarcerated in New York for burglary and grand larceny at the time of Tenace's second trial. According to Tony, their family often moved around when the children were growing up, and they lived with boxes around their homes because they never settled anywhere to the point where they were completely unpacked. The father of the Tenace children had drinking problems, as did their grandfather. Tony stated that their father was never around, but was physically abusive to him when he was around. Their parents had a lot of fights, and their father would beat up their mother. Tony described his father as "a drunk" and claimed that on one occasion when Tony was about 12 years old, his father, while drunk, tried to touch him inappropriately.

{¶ 74} Tony further testified that their father never accepted Tenace as his son because he believed erroneously that someone else was Tenace's father. Tony also described their father as a "big shot" who at times had a lot of money, but never had time for his children. He recalled that once when their father gave the boys presents, they turned out to be stolen girls' bikes.

{¶ 75} The marriage of Tenace's parents dissolved when their mother, Bonnie, caught their father in adultery. Subsequently, their parents engaged in a long custody battle over the children, and their father brought the children to New York, where they lived with their grandparents. There, the Tenace children had

a reputation as "bad kids." They stole items from neighbors, shoplifted, and generally got into trouble.

{¶ 76} Tony described his mother's second husband, David Sena, as a "pervert" who abused both his wife and stepdaughter. After Bonnie left Sena, she was involved with different boyfriends who were also physically abusive to her. One boyfriend was a "professional forger" who, during the late 1970s, taught the Tenace children how to work credit card and counterfeit-money scams.

{¶ 77} Tony recalled that when all three of the children were under eight years of age, they would steal from storage areas in apartment buildings. He also recalled that Bonnie had brought the Tenace children on a burglary when Tenace was around 11 years old. Tony stated that over the years, Bonnie was involved in "at least half a dozen" lawsuit scams in which she would stage accidents to collect money. Tony noted that their father was also involved in scams, primarily in his construction business—overcharging customers, scheming, and defrauding people.

{¶ 78} Tony also chronicled how he, Tenace, and Tammy would sniff glue, drink alcohol, and take drugs while growing up. Tenace tended to take downers and went on to become a regular crack abuser. Tony recalled that Tenace, as a youngster, would take drugs to try to impress him. Bonnie was addicted to prescription drugs while they were growing up. All three Tenace children became drug addicts.

{¶ 79} Tenace's mother, Bonnie Fay Souza–Wilcox, also testified on Tenace's behalf. Bonnie described her own childhood as involving "a lot of incest * * * a lot of child abuse" perpetrated by her uncles, grandfathers, and stepfathers. She married Tenace's father, Leonard Tenace, when she was 18 years old and had three children with him, all born within approximately three years. Tenace was the middle child. Bonnie asserted that Leonard never accepted Tenace as his son because he thought Tenace's father was someone else. When Bonnie was pregnant with Tammy, her youngest, she caught Leonard cheating on her with both her brother's wife and her baby-sitter's mother. The couple divorced soon thereafter.

{¶ 80} Bonnie received custody of the children. While she was undergoing a hysterectomy for cancer, however, Leonard took the children with him to New York to live. Several years passed before she finally regained custody of the children and moved them back to California. During that time, she remarried, thinking that remarriage would help her regain custody of the children. However, her new husband, David Sena, was a physically abusive alcoholic who she later learned was sexually abusing her children. After several years of abuse, Bonnie took the children back to New York because Leonard Tenace told her he would

help. But that promise turned out to be hollow; Leonard did not support his children. He spent most of his money on drinking and gambling.

{¶ 81} After a couple of bad car accidents, Bonnie became addicted to prescription drugs. She admitted that because she worked a lot of hours, she did not properly supervise her children. In succeeding years, Bonnie moved to Florida, then to Boston. She was addicted to drugs, was arrested for prostitution, and attempted suicide several times. At one point, she was in a mental-health hospital for six weeks. While in another relationship, she went to jail for a year for committing forgery. "[W]e were all locked up" in 1978, she recounted, referring to herself, Tony, and Tenace.

{¶ 82} According to Bonnie, over the years, she and her boyfriends would smoke pot with the children, and she noted that all of her children ended up addicted to cocaine. All three children were in prison at the time of the mitigation hearing because of their drug problems.

{¶ 83} Bonnie stated that Tenace married his girlfriend while he was serving time in the Schenectady, New York jail during the late 1980s. The marriage produced a son named Troy Jr., but the couple separated around 1992.

{¶ 84} Bonnie admitted that she started stealing with her children just before she moved to Florida around the time they were teenagers. She helped them burglarize stores and homes, removing money from cash registers and stealing items like motorcycles from people's homes. Bonnie lamented that Tenace "didn't have one year of his life that was stable or happy or secure with a mother and father."

{¶ 85} Tenace's main mitigation witness was Dr. Janice Ort, a clinical psychologist who had evaluated Tenace. Dr. Ort met with Tenace on three different occasions, spending approximately ten hours interviewing and evaluating him. She also reviewed records pertaining to Tenace, as well as statements of family members and others associated with Tenace's family.

{¶ 86} Dr. Ort chronicled Tenace's life and that of his family. Tenace was born May 21, 1962, the second of three children. His parents divorced in 1964. The children were kidnapped by each parent at one point, and the parents fought over custody for a number of years as they shuttled the children back and forth across the country. Both parents remarried. Bonnie's second husband, David Sena, was consistently described by family members as "a monster, as a child molester, and as a rapist." Bonnie and the children endured physical and sexual abuse by Sena. Dr. Ort noted that Bonnie spent five years with Sena during the children's formative years. Tenace told Dr. Ort that his earliest childhood memory was that of his mother's face coming through a motel window. Tenace also told Dr. Ort that during this time, he "was scared all the time" and that he had memories of only violence and fear.

{¶ 87} Tenace's sister, Tammy, told Dr. Ort that Bonnie would sell Tenace as a child to adult males for sexual purposes and would leave him with gay male friends to baby-sit, knowing that Tenace would be sexually abused. Tenace denied this happened, but did recount vividly how painful it was for him to watch his mother and sister being abused without being able to do anything for them. Dr. Ort noted that for a child that age, it is often more traumatic to observe that kind of abuse of someone one loves and cares about than it is to experience it oneself.

{¶ 88} Dr. Ort stated that the Tenace children became involved in illegal activities—i.e., fire-setting, burglaries, and drug use—before any of them were even ten years old. Tammy recalled that she and her brothers started burglarizing places when Tenace was seven years old. Tony recalled setting fires at about age seven or eight. During this time, Bonnie was not around very much—she ran around a lot and was wild. When Bonnie was around, she not only took the children to places to burglarize, she encouraged them to steal from others. Bonnie would tell her children that if they saw something they liked, they should go ahead and take it because she could not afford to buy it.

{¶ 89} As an adolescent, Tenace was arrested, placed on probation, and placed in a therapeutic after-school program. A report evaluating Tenace at that time remarked that Tenace's family life was chaotic. Tenace was eventually discharged from the after-school program because of his uncooperative behavior. Tony told Dr. Ort that during their adolescence, both he and Tenace were heavily into drugs and shoplifting. The family home was raided several times to recover property that both the parents and children had stolen. At one point, an order of protection was filed in family court against the father, Leonard. He was ordered to refrain from any violence or offensive conduct against Bonnie and the children, and he was ordered to not remove the children from the jurisdiction of the court.

{¶ 90} In December 1977, when Tenace was around 15, his problems were described as resulting from a "disorganized, disruptive and unstable natural family, inadequate supervision at home, past history of delinquent behavior." During the next several years, Tenace was arrested in both New York and California. A report written during this time indicated that Tenace's family was very protective and that the mother tended to move frequently to help Tenace avoid being prosecuted for his crimes. At age 17, Tenace was charged with a number of offenses and was in and out of prison on parole violations over the next eight years. Tenace's mother attempted suicide again, and she was diagnosed with manic depression.

{¶ 91} In 1986 or 1987, Tenace met his wife, Cheryl, and they married in 1988, while he was in jail. Cheryl told Dr. Ort that Tenace had had a nervous breakdown once and had lain naked in an empty tub for more than a day. Cheryl

stated that Tenace was a devoted father after the birth of their child. However, in May 1989, Tenace began using drugs again, and Cheryl kicked him out of their home. Over the next several years, Tenace was in various treatment programs for substance abuse and in jail, at times, for parole violations until he arrived in Toledo in December 1993.

{¶ 92} Dr. Ort reported that as a result of the number of moves that Tenace and his siblings made as children, they attended a number of different schools. Tenace successfully completed only the seventh grade. He repeated eighth grade and then dropped out of school. While in prison, Tenace attended classes at a community college and a junior college and received As and Bs.

{¶ 93} Dr. Ort administered several tests to Tenace, including the Wechsler Adult Intelligence Scale–Revised ("WAIS–R"), the Minnesota Multiphasic Personality Inventory–2 ("MMPI–2"), and the Rorschach Inkblot Test. On the intelligence scale, Tenace's scores fall in the average range of intellectual function. The MMPI–2 test results were invalid. But the Rorschach test led Dr. Ort to make several diagnoses of Tenace's mental condition. First, Dr. Ort diagnosed Tenace as suffering from posttraumatic stress disorder. Tenace experienced personal threats against his own safety, in particular from his stepfather, David Sena. He witnessed sexual and physical abuse to his mother and sister. There were also indications from records compiled by others who evaluated Tenace that he experienced sexual abuse as well.

{¶ 94} Second, Dr. Ort diagnosed Tenace as suffering from a dysthymic disorder—a type of depressive disorder. Third, Tenace has a substance dependence disorder, in particular with cocaine, but also involving alcohol and marijuana abuse. Such abuse interfered with his relationship with his wife and son, as well as his ability to perform the house-repair scams he was engaged in. Dr. Ort noted a high correlation in the professional literature between cocaine use and aggressive behavior.

{¶ 95} Tenace also has an antisocial personality disorder. According to Dr. Ort, the essential feature of his antisocial personality disorder is a history, dating back to when Tenace was 15 years old, of continuous and chronic antisocial behavior in which the rights of others are violated.

{¶ 96} Dr. Ort stated that her diagnoses were based on records, testing, and her interviews. In evaluating Tenace, she noted that her diagnoses were less influenced by the testing she performed than the information from family and friends, the clinical interviews with him, and her review of his records. In her report, Dr. Ort characterized Tenace's childhood as "a tutorial for criminal behavior, and [full] of neglect and abuse." She also concluded that Tenace "is not the one bad apple in the barrel. All his siblings are incarcerated and have lengthy

histories of legal involvement and substance abuse." She asserted that Tenace's parents "were criminals, abusive, neglectful, and substance abusers."

*Sentence Evaluation*

{¶ 97} Undoubtedly, the felony-murder aggravating factor under R.C. 2929.04(A)(7), the senseless and tragic murder of Edward Kozlowski during an aggravated robbery, was proven beyond a reasonable doubt. In weighing the evidence, we must "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender," and the statutory mitigating factors of R.C. 2929.04(B).

{¶ 98} The nature and circumstances of the offense offer nothing in mitigation. Tenace performed some work on Kozlowski's chimney and then later concocted a ruse in order to steal money from him to support his crack addiction. Tenace, 31 years old at the time of the offense, likely had little problem overcoming the 76-year-old Kozlowski, who was reputed to have paid his debts in cash. Kozlowski's robbery and murder were unprovoked.

{¶ 99} R.C. 2929.04(B)(1), victim inducement, is not implicated. Likewise, there is no evidence that Kozlowski provoked Tenace, thereby invoking R.C. 2929.04(B)(2). Dr. Janice Ort testified that Tenace does not suffer from any mental disease or defect, R.C. 2929.04(B)(3). R.C. 2929.04(B)(4) is inapplicable because Tenace was 31 years old at the time of the homicide. He had prior criminal convictions, R.C. 2929.04(B)(5), and was the principal offender in the murder, R.C. 2929.04(B)(6). R.C. 2929.04(B)(7) directs us to consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."

{¶ 100} The words used by the dissent in speaking of the appellant in *State v. Murphy* (1992), 65 Ohio St.3d 554, 587, 605 N.E.2d 884 (Moyer, C.J., dissenting), conceivably describe Tenace here: "destined for disaster * * * as a direct result of the conditions to which he was exposed by his family."

{¶ 101} Tenace was doomed from the start. Both appellant's mother and father were abusive, neglectful, and pernicious influences on their three children, who were schooled in crime from an early age. A second marriage facilitated sexual abuse of Tenace's sister by the children's stepfather. Appellant's mother was addicted to drugs, arrested for prostitution, and jailed for forgery. She attempted suicide several times and spent six weeks in a mental hospital.

{¶ 102} There was evidence that Tenace was made to watch the sexual abuse of his sister and that he was sexually abused himself—at one point being sold by his mother for sexual services. Both his grandfather and father were alcoholics, and his father, assuming Tenace was not his son, physically abused him. He was

kidnapped by each parent during a drawn-out custody fight. While still a child, he began abusing substances with his mother and her boyfriends, eventually graduating to cocaine. He was encouraged to cheat and steal. Tenace's brother and sister became addicts as well and were in prison at the time of his mitigation hearing because of their drug problems.

{¶ 103} Dr. Ort concluded that Tenace's parents were criminals, were abusive, and were neglectful substance abusers. His childhood was a "tutorial" for criminal behavior, and, in fact, he has an antisocial personality disorder. Although he completed only seventh grade, Tenace received As and Bs while attending community college and junior college in prison.

{¶ 104} Tenace also expressed remorse and sorrow during his confession to police, *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, and cooperated with police after his arrest. *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988. The love and support of the family members who testified on Tenace's behalf also deserve some mitigating weight. See, e.g., *State v. Bays* (1999), 87 Ohio St.3d 15, 34, 716 N.E.2d 1126. Finally, if Tenace is given maximum and consecutive sentences to the sentence of 25 years to life he received for crimes committed in New York, he would be at least 96 years old before his first eligibility for parole in Ohio. See *Bradley*, 42 Ohio St.3d at 149, 538 N.E.2d 373.

{¶ 105} A single one of these facts, standing alone, would not establish that appellant's history, character, and background were so impaired as to outweigh the aggravated robbery and murder of his elderly victim. However, the foregoing evidence, viewed cumulatively, establishes the presence of R.C. 2929.04(B)(7) "other factors" that strongly militate against imposing the death sentence. While nothing condones Tenace's gratuitous killing of an elderly man, the evidence presented in mitigation on Tenace's behalf is entitled to great weight.

{¶ 106} Based upon an independent review of the evidence, we conclude that the aggravating factor does not outweigh the mitigating factors in evidence to support a sentence of death. R.C. 2929.05(A). Accordingly, we affirm the conviction but vacate the sentence of death and remand the cause to the trial court for resentencing consistent with R.C. 2929.06.

Judgment affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., PFEIFER and LUNDBERG STRATTON, JJ., concur.

RESNICK, O'CONNOR and O'DONNELL, JJ., concur in part and dissent in part.

LUNDBERG STRATTON, J., concurring.

{¶ 107} I join the majority's opinion but write to add that we struggle constantly with the issue of when a defendant's childhood is so horrific that it militates against the death penalty. In reading this record, one cannot imagine a more terrible, depraved, and damaging childhood than that which the defendant suffered. He was victimized constantly as a child. The only skills taught him by the adults in his life were how to commit crimes and how to abuse drugs. All his siblings are now in prison, none being able to rise above their doomed childhood. If these facts don't present a case in which mitigation finally outweighs the aggravating circumstance, then I can imagine no fact pattern that would. While it still in no way justifies the brutal murder, his terrible childhood does militate against the death penalty and in favor of a life sentence. Therefore, I respectfully join in the majority's decision to remand this cause for resentencing.

---

O'CONNOR, J., concurring in part and dissenting in part.

{¶ 108} I concur in the majority opinion in all aspects except in its conclusion that the death sentence should not be imposed upon Tenace. I would hold that the aggravating factor, that Tenace murdered Kozlowski while committing an aggravated robbery, outweighs the mitigating factors.

{¶ 109} Tenace planned and executed a robbery of Kozlowski and then murdered him by "stomping" on his head and strangling him. He pulled the telephone cord out of the wall so that Kozlowski could not summon assistance, and he left Kozlowski to die on the floor of his own home. Although it is true that Tenace endured a troubled childhood and dysfunctional family life, cooperated with police, and expressed remorse for his actions, the robbery and brutal murder of this 76–year–old man in his home merit the capital penalty to which Tenace was sentenced. I agree that the tragedies suffered by Tenace as a child are lamentable, but they are simply not enough to overcome the fact that Tenace committed a horrific murder to cover up his own robbery.

{¶ 110} This court has "seldom accorded strong [mitigating] weight to a defendant's childhood," *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765, and previously has upheld the death penalty in cases involving commission of aggravated murder during an aggravated robbery by a defendant with a chaotic and dysfunctional childhood. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 429, 692 N.E.2d 151; *State v. Raglin* (1998), 83 Ohio St.3d 253, 274, 699 N.E.2d 482; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 400–401, 721 N.E.2d 52; *Murphy*, 91 Ohio St.3d at 547, 747 N.E.2d 765. In each of these

cases, the defendant suffered physical abuse and/or neglect by a parent or parents who were involved in a life of crime. In *Raglin,* the defendant even accompanied his mother on drug deals in order to protect her, and his mother later illicitly removed him from a detention facility. These cases involved defendants with mitigating factors similar to Tenace's. Yet in each case, this court affirmed the death penalty in spite of the mitigating factors.

{¶ 111} Since the institution of independent review of death-penalty cases under R.C. 2929.05, this court has vacated the death sentence based on that review in only two instances.[2] In *State v. Claytor* (1991), 61 Ohio St.3d 234, 574 N.E.2d 472, the defendant, who lacked any criminal record, had killed two security guards who had approached him for identification. The court determined that the murders had been a product of Claytor's mental disease—paranoid schizophrenia—and that Claytor substantially lacked the ability to refrain from committing the crimes.[3]

{¶ 112} In *State v. Lawrence* (1989), 44 Ohio St.3d 24, 33, 541 N.E.2d 451, the defendant was a Vietnam veteran without a significant criminal history who suffered from posttraumatic stress disorder. A loving father and son who had even cared for his sick mother during his high school years, he had spiraled into severe depression after the death of his infant son due to sudden-infant-death syndrome. After requesting that his neighbor tone down a loud, late-night party, Lawrence responded to taunts by the neighbor and his guests by firing a shot that wounded the neighbor and the neighbor's guest. The neighbor subsequently returned fire upon Lawrence. In response, Lawrence shot his two neighbors to death and wounded two additional guests. Although a jury recommended imposition of the death penalty, this court considered the aggravating and mitigating factors and held that the provocation by the neighbor, coupled with Lawrence's past good deeds, outweighed the aggravating factor of the murders.

{¶ 113} The facts in *Claytor* and *Lawrence* are entirely different from those in this particular case. Undisputed testimony established that Claytor, a generally law-abiding individual, could not prevent himself from acting, because of his mental illness. Lawrence also had led a law-abiding life, caring for those around

---

2. Although a third case purports to do so, that case actually turned on "residual doubt" because mitigating evidence was not presented at the death-penalty hearing. *State v. Watson* (1991), 61 Ohio St.3d 1, 572 N.E.2d 97, overruled on this ground by *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112.

3. As the only appellate court to reverse a death penalty based upon the independent review mandated by R.C. 2929.05, the Fifth District Court of Appeals similarly overturned the death penalty of a man who suffered from paranoid schizophrenia and could not substantially appreciate the criminality of his behavior. See *State v. Glenn* (Feb. 19, 1987), 5th Dist. No. CA–798, 1987 WL 7163.

him, volunteering his time, and risking his life to serve his country. He had acted based upon his severe depression and the provocation of his neighbor. Tenace, on the other hand, was raised in a dysfunctional family, but had no relevant mental defects and purposefully chose to engage in a life of crime.

{¶ 114} Although the majority asserts that the lives of Tenace's siblings show that Tenace never had a chance to lead a law-abiding life, that allegation is misleading. There is a fundamental difference between leading a "life of crime" and committing a brutal murder. Tammy Bruno, Tenace's sister, who suffered the same upbringing as Tenace but further endured extensive sexual abuse, has been convicted only of nonviolent crimes. Tenace's brother may have a reputation for violence in prison and an extensive criminal history, including arson, armed robbery, burglary, assault on a peace officer, and grand larceny, but he has never committed a murder.

{¶ 115} Tenace remains the only family member with a conviction for murder. He chose an extreme path that his siblings have resisted. As I believe that the mitigating factors do not outweigh the aggravating factor, I would affirm the death penalty in this case.

RESNICK and O'DONNELL, JJ., concur in the foregoing opinion.

———————

Julia R. Bates, Lucas County Prosecuting Attorney, and Craig T. Pearson, Assistant Prosecuting Attorney, for appellee.

Gamso, Helmick & Hoolahan, Jeffrey M. Gamso, and Gary W. Crim, for appellant.