**[Cite as *State v. Bump*, 2023-Ohio-3727.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2023-CA-4 |
| v. | : | Trial Court Case No. 2022 CR 00168 |
| JOHN CURTIS BUMP | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on October 13, 2023

. . . . . . . . . . .

GARY C. SCHAENGOLD, Attorney for Appellant

JANE A. NAPIER, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant John Curtis Bump appeals from his conviction and sentence on one count of domestic violence, a felony of the fourth degree, in the Champaign County Common Pleas Court. Bump argues that the trial court erred in overruling his Crim.R. 29 motion and that his conviction was not supported by sufficient

evidence.   For the following reasons, the judgment of the trial court will be affirmed.

## I.    Facts and Procedural History

{¶ 2} On August 15, 2022, John[1] was charged with domestic violence, with a prior conviction, in violation of R.C. 2929.19(A) following a police investigation relating to an incident involving John and his grandfather, James Bump.   Following a waiver of a preliminary hearing in the Champaign County Municipal Court, on August 29, 2022, John was indicted on the same charge.   He entered a not guilty plea and the case proceeded to a jury trial.   The following evidence was presented at trial.

{¶ 3} On the afternoon of August 12, 2022, John went to his father Curtis Bump's home to pay Curtis some money owed on a loan.   James, Curtis' father, was present helping Curtis fix some steps on Curtis' deck.   An argument ensued between John, Curtis, and James regarding John's recent loss of employment.

{¶ 4} James testified that John became belligerent and threatened to assault both Curtis and James.   Following the threat, John came at James with both fists up.   James, who had a drill in his right hand, turned around toward John and used his left hand to block John's punch.   However, John managed to strike James once in the head on the left-hand side, hitting his ear and bruising his face.   Because James used his left hand to block John's strike, his finger was struck, and it was later determined to be broken. James testified that after being struck he fell to the ground, dropped the drill, and grabbed a wooden board to defend himself.   Curtis then stepped between them and told John to leave, which he did.

---

[1] To prevent confusion, we will refer to the members of the Bump family by their first names.

{¶ 5} Curtis similarly testified that he and James were repairing the steps on his deck when John came over to his house. When discussing John loss of his job, John became irate, cursed, yelled, and threatened to beat up his father and grandfather. When James stood up while holding the drill, John punched James on the left side of James' head and knocked him to the ground. Curtis stated that he got in between James and John to intervene. Curtis testified that after James fell to the ground, James grabbed a wooden board, but Curtis took it from him and told John to leave. After John left, they looked at James' injuries and then finished putting the steps together.

{¶ 6} Both James and Curtis denied that James had made any threats to John prior to John's attack on James. Neither James nor Curtis called the police regarding the incident, because neither of them wanted John to get into trouble. Instead, John went to the police department later that day and met with Officer Keith Hurst of the Urbana Police Department. Officer Hurst testified that John had claimed that James attacked him at Curtis' house that day after James got angry with him for losing his job. John told Officer Hurst that James swung a drill at him along with a piece of wood but that he was never actually hit with anything.

{¶ 7} When Officer Hurst went to Curtis' house to inquire about the allegations, Curtis appeared surprised and told Officer Hurst that John had attacked James, not the other way around. After speaking with Curtis, Officer Hurst went to James' home to speak with him about the incident. Officer Hurst testified that James also seemed surprised about the allegations and confirmed that John had punched him in the face. Officer Hurst personally observed the injuries to James' head, which appeared to have

occurred relatively recently, and took a photograph of the injuries.

{¶ 8} After speaking with James, Officer Hurst went to John's house. When Officer Hurst mentioned seeing James' injuries, John denied attacking James and claimed that James must have injured himself just to get John in trouble. Thereafter, John was arrested for domestic violence.

{¶ 9} After the State presented its case, John moved for a Crim.R. 29 acquittal, but the trial court denied his request. John then testified in his own defense. He stated that on August 12, 2022, he went over to his father's home to pay back some money he owed. The conversation turned to the loss of his job, and neither Curtis nor James believed John as to why he had been fired. According to John, James was upset about John's "job-hopping" and threatened to hit him. At that time, James had a drill in his hand and raised it up, so John raised his hands in front of his face above his head and ducked backward. John testified he did not tense up his hands into a fist, because he had a reflex not to do that from his training in karate. Although John claimed that James swung at him with the drill, John stated that James missed and then dropped the drill to grab the wooden board. However, Curtis intervened and told John to leave, so he did.

{¶ 10} John testified that he had difficulty communicating with people and generally tried to avoid conflict or to flee from difficult situations. He explained that when he went to the police department, he did not want to press charges against his grandfather, but he needed a neutral party to intervene. John denied that he ever attacked his grandfather and claimed he had no idea how James had been injured.

{¶ 11} Of controversy at trial was the relationship between James and John. John

did not dispute that they were related by consanguinity, but John claimed he and James had never lived in the same household so as to qualify as family or household members for purposes of domestic violence. James testified that John, his two siblings, and John's mother had lived with James for about a year when Curtis had been deployed to Korea and again for another year a few years later when Curtis had been deployed to Germany. Additionally, after Curtis and his wife divorced, when Curtis had custody of his three children, they also lived with James for about a year. James could not recall how old John had been when John lived with him, but John had been a minor at the time and in school. James testified that John had not lived with him at any point after John turned 18-years-old.

{¶ 12} John, on the other hand, denied ever living with James except when he would visit his father on occasion after his parents divorced. John did not recall his father's deployments and said they must have happened when he was a child "before I was even cognizant." Tr. 163. When asked if it was possible that he had lived with his grandfather when his father was deployed, he agreed that he could not say it had not happened, just that he did not recall it because he would have been too young.

{¶ 13} At the time of the incident, James was 77 years old, weighed about 170 pounds, and was five feet, four inches tall. John was 29 years old, weighed about 270 pounds, and was six feet, three inches tall. The parties stipulated that John had previously been convicted of domestic violence.

{¶ 14} After the trial court overruled John's renewed Crim.R. 29 motion at the close of all the evidence, John was found guilty as charged. He was sentenced to a community

control sanction for a period of three years. John timely appealed and raises the following two assignments of error:

> THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S RULE 29 MOTION FOR ACQUITTAL BASED ON THE STATE'S FAILURE TO PROVE THAT APPELLANT AND HIS GRANDFATHER (COMPLAINANT) MET THE DEFINITION OF A FAMILY OR HOUSEHOLD MEMBER AS SET FORTH IN 2919.25(F)(1) OF THE OHIO REVISED CODE.

> APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

## II.    Sufficiency of the Evidence

{¶ 15} Because they are interrelated, John's two assignments of error will be discussed together. John first argues that the trial court erred in overruling his Crim.R. 29 motion for acquittal, because the evidence presented was legally insufficient to sustain his conviction for domestic violence. In his second assignment of error, John contends that the guilty verdict in this case was not supported by sufficient evidence.

{¶ 16} Crim.R. 29(A) states that when a motion for acquittal is made after the evidence on either side is closed, a court shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction" for the charged offense. "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. "A sufficiency of the evidence

argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Finn*, 2d Dist. Montgomery No. 22914, 2009-Ohio-4949, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 17} When reviewing the sufficiency of the evidence, "the court does not engage in a determination of the witnesses' credibility." *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Rather, the relevant inquiry is whether the evidence presented, if believed, was sufficient to support the conviction. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *Thompkins* at 390. The verdict will not be disturbed on appeal unless "the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jenks* at 273.

{¶ 18} John was convicted of one count of domestic violence with a prior conviction, in violation of R.C. 2919.25(A), (D)(3). Therefore, the State was required to

prove beyond a reasonable doubt that John did knowingly cause or attempt to cause physical harm to a family or household member, and he had previously been convicted of domestic violence or another qualifying offense. Both in his Crim.R. 29 motion and again here on appeal, John challenges whether there was sufficient evidence that James qualified as a family or household member. Insofar as relevant here, "family or household member" is defined as someone "who is residing or has resided with the offender" and is "a parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender[.]" R.C. 2919.25(F)(1)(a)(ii). John does not contest that he and James were related by consanguinity but rather that the State failed to present sufficient evidence that he and James had ever resided together.

{¶ 19} During the trial, James testified that John had lived with him on a full-time basis on three separate occasions. The first time was when Curtis was deployed to Korea and John lived with James for a year, along with John's mother and siblings. The second time occurred when Curtis was deployed to Germany, and John again lived with James for a year. The third time occurred after John's parents divorced, and Curtis lived with James for a little over a year. James explained that during each of these occurrences, John lived with him on a full-time basis and was a minor. Nevertheless, John contends that "no reasonable interpretation of the statute would include an infant or toddler incapable of sentient recall as a household member in the home of a grandparent while in the custody of a parent when the other parent is away on military duty." Brief of Appellant, p. 7. This is likely based on John's testimony during trial that he did not recall ever living with James and that, if his father had ever been deployed, it "had to have been

before I was even cognizant. I was still a child." Tr. 163. When asked on cross-examination if he may have lived with James while Curtis was deployed, John indicated that he could not say whether it did or did not happen, but he did not remember because he would have been too young. Tr. 195-196. John was 29 years old at the time of the offense and 30 years old at the time of trial. Thus, the crux of John's argument is that even if he had lived with James as a young child, it was so long ago that James could not qualify as a "family or household member" pursuant to R.C. 2919.25(F)(1)(a)(ii). We disagree.

{¶ 20} R.C. 2919.25(F)(1)(a)(ii) has no temporal limitation, meaning that "[t]here is no specific time frame in the statute as to when the 'residing' had to occur." *State v. Turner,* 8th Dist. Cuyahoga No. 102984, 2016-Ohio-813, ¶ 19. The plain language of R.C. 2919.25(F)(1)(a)(ii) does not specify any time frame or length of time that an offender must have resided with the other individual, just that they did reside together at the time of the offense or had resided together in the past at some point in time. We will not read into the statute a temporal limitation that is not there. *Compare* R.C. 2919.25(F)(2) (imposing cohabitation requirement with the offender either presently "or who otherwise has cohabited with the offender *within five years prior to the date of the alleged commission of the act in question."* (Emphasis added.)).

{¶ 21} In this case, James testified that John had lived with him full-time on at least three separate occasions, for approximately a year's length on each occasion. The fact that John may have been a child and did not recall living with his grandfather did not mean that the verdict was supported by insufficient evidence. Viewing the totality of the

evidence in a light most favorable to the State, as we must, we conclude that a rational trier of fact could have found that James and John were family or household members as defined in R.C. 2919.25(F)(1)(a)(ii). John's conviction was supported by legally sufficient evidence, and the trial court properly overruled his Crim.R. 29 motion for acquittal. John's two assignments of error are overruled.

### III. Conclusion

**{¶ 22}** Having overruled the two assignments of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .


WELBAUM, P.J. and HUFFMAN, J., concur.