[Cite as *State v. Arthurs*, 2013-Ohio-3138.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99087**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# MATTHEW T. ARTHURS

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-565849

**BEFORE:**   S. Gallagher, J., Stewart, A.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:**   July 18, 2013

**ATTORNEY FOR APPELLANT**

Scott D. Claussen
Law Office of Scott Claussen
4834 Autumn Lane
Brooklyn, OH   44144


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: James A. Gutierrez
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113

SEAN C. GALLAGHER, J.:

{¶1} Defendant-appellant Matthew Arthurs appeals from his convictions for theft. For the following reasons, we affirm.

{¶2} The Cuyahoga County Department of Senior and Adult Services received a hotline referral on August 25, 2011, regarding concerns of exploitation of an elderly victim, Richard Maddock. According to the referral, between May 21, 2009 and August 18, 2011, Maddock gave $415,518 to his neighbor, Arthurs.

{¶3} Melissa Farone, a social worker with more than ten years' experience, commenced her investigation of the case on August 25, 2011, by meeting with Maddock at his Lakewood apartment. She testified that Maddock was 77 years old, never married, lived alone, and used a cane. Farone did not see a television or any expensive furniture in Maddock's apartment. Maddock admitted to her that he gave the money to his only friend and acquaintance, Arthurs.

{¶4} Farone met with Maddock again on August 31, 2011. She obtained a release from Maddock in order for her to speak about him with Arthurs. Farone testified that following this visit, she went to the Lakewood Police Department with her belief that Arthurs was exploiting Maddock.

{¶5} During her fourth visit with Maddock on September 19, 2011, Maddock signed a service plan at Farone's request. Concerned about Maddock's judgment and

his overall thought process, Farone recommended a geriatric assessment as part of the service plan to review Maddock's ability to make independent decisions.

{¶6} Farone testified that her first attempt to meet with Arthurs failed when Arthurs did not answer his door even though she thought she heard the television inside the apartment. Farone ran into Arthurs, however, as she exited the apartment building after her fourth visit with Maddock. Farone testified that Arthurs knew immediately she was at the building to visit Maddock. When Farone asked about the money he received from Maddock, Arthurs initially responded that it amounted to "thousands of dollars." Farone asked for a more specific figure, and Arthurs replied that it was about $100,000.

{¶7} Although Arthurs told Farone that he used the money to pay bills, rent, and automobile repairs, Farone testified that he admitted "[h]e didn't have anything to show for the money." Arthurs also told Farone that he used some of the money to retain an attorney who advised Arthurs that "if the person wasn't demented, that it was okay that he gave him the money."

{¶8} Arthurs provided Farone with one of five to six copies of a letter dated September 12, 2011, addressed to her from Maddock. The letter indicated that when Maddock was in the hospital for heart surgery, the doctors and staff did not find any evidence of dementia; Maddock voluntarily gave Arthurs the money; Arthurs reimbursed Maddock on September 10, 2011 for $1,000; and Maddock wanted to remain independent and take care of himself, and not have to undergo a geriatric assessment. Farone

testified that the letter's contents were not a surprise to her because none of her clients desire a geriatric assessment.

{¶9} Farone testified that Maddock informed her of his history of heart problems and loss of hearing. Farone also learned that while Maddock was in the hospital for the heart surgery, Arthurs brought Maddock his checkbook and Maddock wrote him checks.

{¶10} Valeri Koehler, a social worker and investigator for the probate court with 12 years of experience, evaluated Maddock's need for a guardian based on Farone's investigation. Her primary responsibility is to "assess the need for guardianship in a person for whom guardianship has been applied for, and to serve notice to the person as to upcoming guardianship and pending application." Koehler testified that guardianship may be appropriate when a person is being considered for adjudication as mentally incompetent.

{¶11} Koehler also testified that when she met Maddock, "the first thing that was really dramatic was how apparently unconcerned [Maddock] was about loaning his neighbor over $300,000." She found Maddock's general denial about concerns over the loans as itself "a cause for concern."

{¶12} Koehler had other than financial concerns related to Maddock because of vulnerability displayed during her visit with him in November 2011. She testified that his vulnerabilities included his elderly age, "physically not intact" nature, and cognitive impairments. Koehler also testified about learning from his medical records of Maddock's cognitive disorder diagnosis in 2010.

{¶13} Koehler testified that her written report describes Maddock as "of at least average intelligence, but has extremely impaired insight and judgment, with regards [sic] to his management of finances." Maddock also "presents as having a naive or very susceptible and vulnerable perception of the world around him, rather than being unintelligent." Koehler testified that Maddock generally responded to her questions in a logical manner, except she found illogical his lack of concern over his money or Arthurs's taking advantage of him.

{¶14} Because of her concerns about Maddock's insight and judgment, Koehler testified that she served him with a notice of guardianship. On December 13, 2011, the probate court assigned Maddock a guardian after adjudicating him mentally incompetent.

{¶15} The trial court in the underlying action deemed Maddock competent to testify for the state. Maddock stated that he is 78 years old, and has been Arthurs's neighbor for years. Maddock testified that he gave the money, up to $10,000 at a time, to Arthurs because Arthurs needed the money for a "legitimate cause." Maddock testified further that Arthurs told him he needed the money for living expenses, including food and rent, but did not tell him about using the money for medical bills, attorney fees, or gambling. Maddock and Arthurs more or less agreed to each payment amount, but Maddock did not remember the substance of their conversations.

{¶16} Maddock testified that he was surprised to learn that Arthurs was working at American Greetings during some of the time he was receiving Maddock's money. Maddock testified further that he would not have given Arthurs the money if he knew

Arthurs was employed and was gambling. Finally, when questioned as to whether he wanted a guardian, Maddock testified, "I more or less resigned myself to the fact that yes, the circumstances were such that it warranted my being put under guardianship" because of the money given to Arthurs.

{¶17} Assistant Prosecuting Attorney Kelli Perk primarily represents Adult Protective Services ("APS") in probate court. She provides consultation services and refers matters to the court for guardianship proceedings following a social worker's identification of alleged neglect, abuse, or exploitation.

{¶18} Perk testified that she received a 2010 medical report from Dr. Michael Dayem. Dr. Dayem was concerned that Maddock had a cognitive disorder.

{¶19} Perk also testified that the hotline referral from APS stated that in the two years before the report, "Mr. Richard Maddock had depleted his bank account from $450,000 to I think $25,000 in his checking, $35,000 in his savings, and they made the report to Adult Protective Services due to exploitation." Perk referred the matter to probate court because of the number of checks written by Maddock, Dr. Dayem's 2010 concern about a cognitive disorder, and Maddock's refusal to submit to a geriatric evaluation.

{¶20} The probate court contacted attorney Hugh Carlin in October 2011 about Maddock's need for a guardian. Carlin met with Maddock on December 9, 2011, to discuss the conservatorship and guardianship. While Maddock was initially resistant,

Carlin testified that Maddock later expressed concern to him about the large amount of money he gave to Arthurs.

{¶21} Carlin testified that Maddock's bank account fell from over $400,000 to $27,000 from May 2009 to June 2011. Maddock also had a small amount of money in his every day checking account that he used for monthly income deposits. According to Carlin, the loss of over $400,000 "decimated Mr. Maddock's future," and Maddock needs that money because of ongoing mental and physical health issues. Carlin opined the $2,700 per month received currently by Maddock through retirement sources is insufficient, and would eventually lead to Maddock's placement outside his home.

{¶22} Dr. Jody Lynn Pickle, a licensed clinical neuropsychologist, performed Maddock's competency evaluation. As part of her evaluation, Pickle tested him in a variety of areas, including tests that helped her assess his functionality in the community.

{¶23} Pickle met with Maddock when Maddock was 77 years old. She testified that Maddock was never married, lived alone, and was somewhat isolated and ill. Pickle stated while Maddock liked to be around people, he was lonely and vulnerable because of the loss of his friends and family members.

{¶24} Pickle also testified about Maddock's health, noting that he had not taken care of himself for years. Pickle testified about Maddock's edema, malnourishment and ensuing weakness, bed sores, and the removal of all of his teeth in 2010 because of deterioration. She opined, "what was going on with him medically, he may sit there and

look at you and tell you that he's doing well, but it's very clear, based on his physical condition, that he was not."

{¶25} Pickle next testified that she analyzed Maddock's MRI taken a couple days before their meeting, and he qualified for a diagnosis of vascular dementia. Pickle explained there are very small microvascular changes over time associated with ischemic heart disease, and "what you're doing is you're disrupting that impulse to the front part of the brain, which impairs decision making capacity." According to Pickle, the combination of the MRI results with Maddock's performance on neuropsychological testing, "which showed memory impairment, [and] visual spacial impairment, qualified him for a diagnosis of vascular dementia." She stated this condition "is cumulative over time," and possibly occurred over a period of years. As to the effects of vascular dementia, Pickle testified, "[t]he fact that he couldn't look out for his self interest, that he was giving such a large sum of money away to someone, for very little substantial reason, I think is very much heavily weighed into whether or not he * * * had the decision making capacity." In other words, she concluded Maddock lacks decision-making capacity because of the vascular dementia:

> Q. And based upon your training and experience, and all the factors and facts that you looked at, would giving away large amounts of money, for lack of a better word, fit into what we're talking about now?
>
> * * *
>
> A. You know, lacking capacity means that you don't have the ability to
>
> not — not have the capacity to make decisions regarding your finances and

welfare, has to do with the ability to look out for your own self interest. In my opinion giving away the bulk of the money that you have, such a large sum of money to someone else, when you're 77 years old and you need that money to take care of yourself, as you get older, or to eat and live. I mean, he could be living in the lap of luxury and having the care that he needed for the rest of his life, with $400,000. He did not look at his best interest. That combined with the medical results, with the psychological and neuropsychological test data, as well as my experience as a forensic neuropsychologist, yes, I do believe that all of these are cumulative and led up to him making the decision that he made [to give Arthurs the money].

**{¶26}** Pickle turned to the significance of Maddock's description as a "poor historian" in his 2010 medical records. Pickle explained that "poor historian" is a common description for someone who has difficulty providing his or her medical history because of confusion or memory impairment. She noted a number of hospital staff described him as confused and forgetful while in the hospital for heart surgery.

**{¶27}** Pickle also offered testimony about how a layperson should view Maddock's behavior. She stated that if there is an elderly person who looks very sick, and is not making good decisions, it should become clear to a layperson who is taking money from the elder, the layperson is exploiting the elder. Pickle explained that while it may be normal for an elder to give minimal sums of money to someone, a layperson

should know there is something wrong with an elder's judgment if the elder repeatedly gives the layperson large sums of money.

{¶28} Finally, Pickle testified about the significance of not having a specific diagnosis of vascular dementia or cognitive disorder prior to 2010. She stated whether "there is a diagnosis or not, the disease is still there." In her opinion, although legally competent in 2009 and 2010, Maddock lacked decision-making capacity in 2010, and was probably impaired in 2009 "based on the fact that he was giving away large sums of money, that he had chronic medical conditions and that he had a significant time — things that take time to accumulate on his MRI."

{¶29} Brian E. Moses, an employee service representative for American Greetings, testified about Arthurs's employment history with the company. Arthurs was an employee from May 23, 2005, until January 23, 2009, when there was a layoff. American Greetings rehired him on December 14, 2010. American Greetings terminated Arthurs, however, on June 21, 2011, for his failure to call or show up for work for three days.

{¶30} Detective Ginley from the City of Lakewood Police Department investigated this case. He began his investigation after a December 29, 2011 meeting with Maddock's guardian, Carlin, and a private investigator. Ginley received records from APS, and subpoenaed Maddock's and Arthurs's bank records. Ginley learned from Maddock that he never married and had no family. Maddock also told Ginley he inherited $350,000 from a brother who died in 2004.

{¶31} Ginley testified that Maddock wrote out 188 checks made out to Arthurs over a 27-month period. The checks totaled $415,518 and averaged approximately $15,000 per month.

{¶32} Finally, Ginley investigated Arthurs's claim that he needed a portion of Maddock's money for repairs to a car following an accident. Ginley discovered a 2010 accident, but the accident was a "very minor" fender bender. Arthurs was involved in a second car accident during the period in question. His car was struck from behind, but there was only an initial report available for this accident.

{¶33} Because Ginley's investigation led him to the Ohio Lottery, Carl Ketterer, a lottery investigator, testified about Arthurs's 35 instant lottery ticket winnings of amounts greater than $599. Ketterer compiled a spreadsheet of the winnings for the period of June 13, 2008 through November 2, 2011. Arthurs won a total of $64,000 during this time period. The spreadsheet shows that 27 of the wins occurred while Maddock was writing out checks to Arthurs, including a $24,000 win on October 27, 2009, when Arthurs was not employed at American Greetings. Ketterer explained there is no record of how much Arthurs spent on nonwinning tickets or tickets that paid out less than $599.

{¶34} On August 16, 2012, a grand jury returned a two-count indictment against Arthurs. The charges were two counts of theft in violation of R.C. 2913.02(A)(1) and 2913.02(A)(3).

{¶35} Arthurs entered a plea of not guilty on August 21, 2012. He executed a jury waiver on September 24, 2012, and a bench trial commenced that day. The trial

court returned a verdict of guilty on both charges following the trial. The trial court sentenced Arthurs on October 15, 2012, to a term of six years.[1] This appeal followed.

**{¶36}** In two assignments of error, Arthurs asserts that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. He argues the state failed to show Maddock suffered from any mental deficiencies until the end of 2011 when the probate court adjudicated him mentally incompetent and appointed a guardian. Arthurs essentially claims that over approximately two years, Maddock voluntarily consented to signing, with full cognitive ability, 188 checks to Arthurs for a total amount of $415,518. He also argues that because he intended to repay Maddock as demonstrated by Maddock's admission to repayment of $6,500 by Arthurs, there can be no "intent to deprive" Maddock of his money.

**{¶37}** When an appellate court reviews a claim of insufficient evidence, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶38}** When reviewing a claim challenging the manifest weight of the evidence, the court, after reviewing the entire record, must weigh the evidence and all reasonable

---

[1]In its October 18, 2012 journal entry, the court stated: "Defendant and the state stipulate the [theft] counts are allied offenses of similar import that merge for the purposes of sentencing on the record, and the state elects to proceed to sentencing on count one."

inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶39} R.C. 2913.02(A) states that

[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent; * * * [or] (3) By Deception.

{¶40} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B).

{¶41} R.C. 2913.01(A) provides:

"Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false

impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

**{¶42}** In applying the applicable standards of review, we conclude the suffiency and weight of the evidence support Arthurs's convictions for theft. The evidence shows that Arthurs, with purpose to deprive Maddock of his money, knowingly obtained the $415,518 without Maddock's consent and by deception.

**{¶43}** The state's witnesses included two social workers, Farone and Koehler; an assistant prosecutor, Perk; Maddock's guardian, Carlin; and a clinical neuropsychologist, Pickle. Contrary to Arthurs's assertion that Maddock was fully competent until adjudicated mentally incompetent in late 2011, all of these witnesses, in one form or another, testified that Maddock lacked the cognitive ability in 2010 or earlier to consent to the payments made to Arthurs. As specifically testified to by Pickle, he lacked decision-making capacity in 2010. She also testified that Maddock was probably impaired in 2009 because he was giving away large sums of money, and his condition was cumulative over time. Moreover, the fact Maddock nearly depleted his $400,000 savings, thereby jeopardizing his future, supports the trial court's conclusion that Arthurs knowingly deprived Maddock of over $400,000 without Maddock's consent.

**{¶44}** Testimony was also offered that Maddock's mental deficiencies were apparent in his physical condition. One can only speculate why Arthurs, who was Maddock's neighbor for years, would not have noticed the same difficulties in decision-making abilities and Maddock's physical deterioration when multiple witnesses testified to these conditions after only minimal visitation.

{¶45} There is also no plausible explanation for Arthurs's need for the $400,000, including his receipt of $121,050 by means of 90 checks while employed with American Greetings. The magnitude and frequency of Maddock's payments are demonstrated through a two-month sampling during this time period when Arthurs received a total of $47,500:[2]

| Check No. | Date | Amount | Check No. | Date | Amount |
|---|---|---|---|---|---|
| 2094 | 02/08/2011 | $3,000 | 2113 | 03/12/2011 | $2,500 |
| 2096 | 02/10/2011 | $3,000 | 2115 | 03/15/2011 | $2,000 |
| 2098 | 02/14/2011 | $5,000 | 2116 | 03/18/2011 | $1,000 |
| 2100 | 02/17/2011 | $3,000 | 2118 | 03/19/2011 | $2,000 |
| 2102 | 02/22/2011 | $2,000 | 2119 | 03/21/2011 | $2,500 |
| 2103 | 02/24/2011 | $2,000 | 2122 | 03/24/2011 | $2,000 |
| 2104 | 02/26/2011 | $2,000 | 2123 | 03/27/2011 | $2,000 |
| 2107 | 03/01/2011 | $5,000 | 2124 | 03/29/2011 | $2,000 |
| 2110 | 03/05/2011 | $5,000 | 2128 | 04/02/2011 | $1,500 |

---

[2]The $47,500 breaks down to $23,750 per month and approximately $792 per day.

**{¶46}** The record reflects that Arthurs led Maddock to believe he needed the money for a legitimate purpose, living expenses. When Farone asked him about the money, Arthurs told her that he did not have "anything to show for the money." Pickle testified that if there is an elderly person who looks very sick, and is not making good decisions, it should become clear to a layperson who is taking money from the elder, that the layperson is exploiting the elder. Arthurs, however, knowingly accepted the money for reasons unknown to Maddock, including gambling, despite Maddock's appearance and overt willingness to just hand it over to him. The record, therefore, supports the trial court's conclusion that Arthurs knowingly deprived Maddock of over $400,000 by deceiving him.

**{¶47}** Arthurs claims the money he took from Maddock was a loan, rather than theft, and Maddock permitted him to use the money to pay for his personal expenses. He also submits that his repayment to Maddock of $6,500 proves he did not intend to deprive Maddock of his money. If Arthurs was sincere in his quest to repay Maddock, however, he would not have voluntarily quit his employment when $409,018 was still owed to Maddock. The record, therefore, supports a conclusion that Arthurs never intended to repay the full amount of money.

**{¶48}** Finally, Farone testified that Arthurs used some of Maddock's money for attorney fees. He specifically sought counsel's opinion that "if the person wasn't demented, that it was okay that he gave him the money." Additionally, Arthurs armed himself with copies of Maddock's letter to Farone wherein Maddock explains that he

voluntarily gave Arthurs the money. This evidence, in combination with the foregoing relating to consent, intention to deprive, and deception demonstrates Arthurs's concerns about Maddock's actions, but also demonstrates Arthurs's continued exploitation of him regardless of these concerns.

{¶49} Although we are able to consider the credibility of the witnesses, we are guided by the presumption that the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Moore*, 8th Dist. No. 98178, 2012-Ohio-5891, ¶ 15, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Accordingly, we afford great deference to the trier of fact's determination of witness credibility. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶50} The trial court, as the trier of fact in this case, opted to believe the state's witnesses about Maddock's decision-making capacity. There was evidence from which the trial court could reasonably conclude that the state established Arthurs's commission of the thefts. We also cannot say that the trial court clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed.

{¶51} Arthurs's assignments of error are overruled.

{¶52} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

MELODY J. STEWART, A.J., and
EILEEN A. GALLAGHER, J., CONCUR