[Cite as *State v. Copley*, 2020-Ohio-1514.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 19AP-420 |
| v. | : | (C.P.C. No. 17CR-287) |
| William A. Copley, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 16, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, William A. Copley, appeals a judgment of the Franklin County Court of Common Pleas entered June 5, 2019 (and corrected on June 19 for clerical error) convicting him of attempted rape and sentencing him to serve seven years in prison. Because Copley's conviction for attempted rape was sufficiently supported by the evidence at trial and not against the manifest weight of the evidence, we overrule both of his assignments of error and affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  On January 13, 2017, a Franklin County Grand Jury indicted Copley for kidnapping and attempted rape arising out of an incident between him and a home healthcare worker assigned to the overnight shift in his apartment.  (Jan. 13, 2017 Indictment.)  Initially, Copley pled not guilty and raised questions about his competency to stand trial.  (Jan 18, 2017 Plea Form; Jan. 24, 2017 Mot. for Exam.)  Following a

competency examination, the parties to the case stipulated that Copley was not competent to stand trial but that he might, through treatment, become competent. (Mar. 23, 2017 Competency Hearing Tr. at 2-4, filed Aug. 8, 2019.) Copley underwent treatment and, during the next hearing approximately six months later, the parties stipulated that Copley had been restored to competency. (Sept. 18, 2017 Competency Hearing Tr. at 2-3, filed Aug. 8, 2019.)

{¶ 3} In December 2018, Copley pled guilty to kidnapping in exchange for dismissal of the attempted rape count. (Dec. 10, 2018 Plea Form; Dec. 10, 2018 Plea Hearing Tr. at 14, filed Aug. 8, 2019.) The trial court received and reviewed a presentence investigation report and thereafter communicated with counsel for both parties about its content. The trial court called the contents of the report "incredibly troubling" and indicated an inclination to send Copley to prison for some period of time. (Feb. 7, 2019 Hearing Tr. at 4, filed Aug. 8, 2019.) Copley then, against the advice of his counsel, moved to withdraw his plea and the trial court permitted him to do so. *Id.* at 3-7; *see also* Feb. 13, 2019 Mot. to Withdraw Plea; Feb. 27, 2019 Entry.

{¶ 4} Approximately four months later, Copley waived a trial by jury and the trial court judge heard Copley's case. (June 3, 2019 Jury Waiver; Tr.[1] at 7-13, filed Aug. 8, 2019.) At trial, the parties entered into several stipulations. They agreed that the alleged victim, T.A., was examined by a nurse following the alleged assault and that, as part of the examination, the nurse took swabs of her neck. (Tr. at 116-18, 146-47.) The parties further stipulated to the admission of exhibits, including photographs of the scene, and that DNA testing was ordered. (Tr. at 149-50.) The parties finally stipulated that the DNA swabs from T.A.'s neck revealed both male and female DNA but that the male DNA was insufficient to determine a DNA profile for the male contributor. (Tr. at 148-49.) In addition to the stipulations, three prosecution witnesses testified—the alleged victim, a coworker of the alleged victim who was present on the evening in question, and the officer who responded to the scene. The defense did not present a case.

{¶ 5} The first prosecution witness to testify was M.W. She testified that, at the time of the events of this case, she worked for a company[2] providing supportive living

---

[1] The trial transcript also includes the sentencing transcript in the same consecutively paginated volume.
[2] The record is not clear as to what company, exactly. At times, witnesses refer to "Columbus Human Health Services," "Columbus Home and Health Services," "Columbus Human Health," "Columbus Center of Human

arrangements to developmentally or mentally disabled persons. (Tr. at 21.) Specifically, she said that she worked at a group home where persons receiving care live independently but are assisted with basic chores, appointments, and outings. (Tr. at 22.) She explained that she and T.A. worked the "sleep shift." (Tr. at 23-24, 33.) This meant that they each slept in a resident's apartment within the group home to be available during the night in case the resident needed nighttime help with medication or other issues, including bathroom use. *Id.*

{¶ 6} On January 6, 2017, M.W. was working the "sleep shift" in a first-floor apartment in a two-story group home. (Tr. at 24-26.) T.A. was working in the apartment upstairs. (Tr. at 26, 28-29.) When M.W. heard noises from upstairs as if a fight were going on, she left the apartment where she was and started up the stairs to see what was happening. (Tr. at 28.) As she ascended, T.A. came running down the stairs. M.W. reversed course and let T.A. into the apartment in which M.W. had been working. (Tr. at 28-29.) T.A., who appeared to have trouble speaking, said that Copley had grabbed her by the neck and lifted her out of bed and off the ground. (Tr. at 29.) T.A. said Copley told her that she was going to "sleep with" him and that he was fully unclothed while he did this. *Id.* M.W. said she and T.A. telephoned the police and their employer to report the incident; the 911 call was played during the trial. (Tr. at 29-30, 35-41.) M.W. said she never saw Copley or entered his apartment but that she also did not see anyone other than Copley leave his apartment that evening. (Tr. at 30, 41.)

{¶ 7} T.A. next testified that on January 6, 2017, she was working in the same capacity as M.W. and staying in the room of a group home resident Copley. (Tr. at 58-61.) She said she had been helping to care for Copley for approximately one year and generally worked the sleep shift. (Tr. at 61-62.) During such shifts, she slept in a separate staff bedroom in his apartment. (Tr. at 68-69.)

{¶ 8} On the night of the incident, she started her shift around 9:00 p.m. by giving Copley his medication. (Tr. at 69-70.) Copley took his medication and prepared food for himself. (Tr. at 72.) At 11:00 p.m., T.A. went into the staff room to sleep. *Id.* She climbed into bed, as was her habit, with the lights on but the comforter over her head. *Id.* Just

Health," "Columbus Center," "Columbus Home Health Services," "Columbus Center for Human Services," "CCHS," or "Columbus Health Human Services." (Tr. at 21, 26, 32, 37, 42, 58, 104.)

minutes later, at 11:03 or 11:04 p.m., Copley entered the room without knocking. *Id.* He kneeled on the bed with his knees on either side of her. (Tr. at 72-73.) When he did that, T.A. removed the comforter from her face and asked what he was doing. *Id.* Copley, who was naked, then began to choke her stating that he wanted to sleep with her and wanted to rape her. (Tr. at 73.) T.A. protested that he could not do that and began to cry for help, all the while attempting to stand and fight off Copley. *Id.* In the struggle, he shoved her around the room and against various objects, including the door, in an attempt to force her to the floor. *Id.* As they struggled, they crushed holes in the walls and cracked T.A.'s phone. (Tr. at 74-75.) Somehow, she managed to fight free and ran from the apartment and down the stairs where she encountered M.W., and they called the police. (Tr. at 75-77.)

{¶ 9} T.A. identified her voice on the 911 call, identified pictures of the damage caused in the struggle, and identified Copley as the individual who attacked her. (Tr. at 83-90.) T.A. said Copley had never made any improper advances toward her before that night. (Tr. at 94.) Nonetheless, she said she had not been able to work since the incident and that an MRI taken after the incident had revealed that she had a protruding spinal disk. (Tr. at 102-03, 106.)

{¶ 10} The final witness to testify was the officer who responded to the scene. (Tr. at 123-26.) The officer testified that when she arrived at the apartment on January 6, 2017, she spoke to T.A. (Tr. at 127.) Despite the fact that T.A. was still having difficulty speaking, T.A. recounted that Copley had entered her room naked and had begun to choke her. (Tr. at 127.) The officer asked Copley no questions at the time of his arrest, but she testified that as she helped Copley into a police vehicle, he spontaneously volunteered that there might be a hole in a wall from a struggle that had just occurred. (Tr. at 130-31.)

{¶ 11} Following closing arguments and the admission of evidence, the trial judge found Copley guilty beyond a reasonable doubt of both indicted counts. (Tr. at 160-61.) In light of the fact that the offenses merged, the prosecution elected to proceed with conviction and sentencing on the count of attempted rape. (June 19, 2019 Corrected Jgmt. Entry at 1.) The trial court sentenced only on that count and sentenced Copley to seven years in prison for the crime. (Tr. at 174.)

{¶ 12} Copley now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Copley alleges two errors for review:

1.  THE   TRIAL   COURT   ERRED   WHEN   IT   DENIED
    DEFENDANT-APPELLANT'S    R.    29    MOTION    FOR
    ACQUITTAL.

2. THE VERDICTS OF KIDNAPPING AND ATTEMPTED
    RAPE WERE AGAINST THE MANIFEST WEIGHT OF THE
    EVIDENCE.

## III.  DISCUSSION

{¶ 14} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990).  "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 15} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' "  *Eastley* at ¶ 10, quoting *Thompkins* at paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594.  In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony."  *Thompkins* at 388, quoting *Tibbs v. Florida*, 457

U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 16} Despite the fact that the standards for sufficiency and manifest weight are different, we address them simultaneously in this decision and context.

{¶ 17} The Ohio Revised Code defines the offense of rape in relevant part as follows:

> (A)
>
> * * *
>
> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

R.C. 2907.02(A)(2). "Sexual conduct" includes both vaginal and anal penetration, as well as oral sex. R.C. 2907.01(A). In relevant part, an "attempt" to commit an offense is defined thus:

> No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

R.C. 2923.02(A).

{¶ 18} In this case, there is no dispute that Copley did not successfully for the purposes of rape penetrate T.A. at any point or manage to complete any other sexual act. Rather, the testimony of T.A., which was buttressed by excited utterances made at the scene to M.W. and the responding officer, was that Copley entered her room completely naked and strangled her while proclaiming his intention to "sleep with" or "rape" her. (Tr. at 29, 72-73, 127.) He was unsuccessful after a violent struggle that damaged the walls of the room and T.A. escaped. (Tr. at 28, 73-75, 130-31.) That the struggle occurred was confirmed by M.W. who heard it, police photographs that documented the damage, and a spontaneous excited utterance by Copley as he was being placed in a police vehicle at the scene. (Tr. at 28, 130-31; State's Exs. A10, A12-A13, A16-A20.) Evid.R. 803(2). Yet, Copley argues that the evidence was not sufficient and weighty enough to convict him of attempted rape

because there was no DNA evidence connecting him to the case, no medical evidence of injury to T.A., and lingering questions as to whether Copley had the requisite mental competence to form the necessary intent. (Copley's Brief at 13, 15.)

{¶ 19} Despite the lack of medically documented injury to T.A.'s throat, two witnesses, besides T.A., testified that she appeared to have difficulty speaking following the alleged strangulation and that same difficulty is evident when listening to the 911 call recording. (Tr. at 29, 127; State's Ex. H.) Though no DNA connected Copley to the offense, it occurred inside his apartment, T.A. (who had helped care for him for one year before he had assaulted her) identified him as the perpetrator, and no one else was seen or apprehended at the scene. (Tr. at 41, 61, 90.) Moreover, though insufficient DNA existed to form a definite profile, male DNA was identified on T.A.'s neck. (Tr. at 148-49.) While questions were raised early in the case as to Copley's competence, the parties eventually stipulated that Copley was competent to stand trial, and the defense did not object nor raise competence or lack of required mental state during the trial. (Tr. at 156-58; Mar. 23, 2017 Competency Hearing Tr. at 2-4; Sept. 18, 2017 Competency Hearing Tr. at 2-3.)

{¶ 20} Under the circumstances, "viewing the evidence in a light most favorable to the prosecution," as we review the evidence, a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal quotations and citations omitted.) *Monroe* at ¶ 47. And for the purposes of Copley's manifest weight argument, viewing that same evidence as we would sit as a proverbial "thirteenth juror" even though a bench trial, weighing the evidence, considering credibility, and drawing inferences the way a juror might, we do not agree that the factfinder here "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Thompkins* at 387. Thus, we find that Copley's conviction was sufficiently supported and was not against the manifest weight of the evidence.[3]

---

[3] Copley in his brief also raises arguments about whether the evidence was sufficient and weighty enough to "convict" Copley of kidnapping. (Copley's Brief at 12.) However, the kidnapping offense merged with the attempted rape, and Copley was only convicted of attempted rape. R.C. 2941.25(A) (stating that where offenses are allied offenses "the defendant may be convicted of only one"); June 19, 2019 Corrected Jgmt. Entry at 1 (noting that the offenses merged and the State elected to proceed to sentencing only on attempted rape). Thus, these arguments are inapposite and moot; we will not address them further.

## IV.  CONCLUSION

{¶ 21} Copley's conviction for attempted rape was sufficiently supported and not against the manifest weight of the evidence.  We thus overrule both of his assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and BEATTY BLUNT, JJ., concur.

———————————