[Cite as *State v. Wilk*, 2022-Ohio-1840.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 110751 |
| v. | : | |
| THOMAS WILK, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 2, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-638204-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, Jeffrey Schnatter and Jasmine Jackson,
Assistant Prosecuting Attorneys, *for appellee.*

Thomas A. Rein, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Thomas Wilk ("Wilk") appeals from his convictions and sentence for rape and other charges following a jury trial. For the reasons that follow, we affirm in part, vacate in part, and remand.

**Factual and Procedural History**

{¶ 2} On March 21, 2019, a Cuyahoga County Grand Jury indicted Wilk on five counts of rape in violation of R.C. 2907.02(A)(2), each with a sexually violent predator specification; two counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) with a furthermore specification; and three counts of gross sexual imposition in violation of R.C. 2907.05(A)(1). These charges stemmed from a pattern of sexual abuse against two young women, A.D., d.o.b. May 14, 2003, and K.P., d.o.b. October 15, 2002, over a period of years.

{¶ 3} Wilk pleaded not guilty to these charges. On June 30, 2021, Wilk waived his right to a jury trial on the sexual predator specifications, and the case proceeded to a jury trial on the remaining counts and specifications.

{¶ 4} The state called A.D. and K.P., as well as A.D.'s mother B.T., and three individuals who had been involved in the investigation of this case.

{¶ 5} A.D. testified that at the time of the incidents in this case, she lived on West 122nd Street in Cleveland, Ohio and was very close to her next-door neighbor Kristalyn Yankovic ("Yankovic"). A.D. explained that the two girls met when they were around six years old and were more like sisters than friends. When they first met, Yankovic lived with her mom, Tamara Patton ("Patton"), and her half-sister Stephanie. In 2011, when A.D. was eight years old, Wilk moved in with Yankovic's family. Wilk was 20 years old at that time.

{¶ 6} A.D. testified that she continued to spend a lot of time with Yankovic and her family, including Wilk, over the next several years. She testified that the

first time she remembered Wilk doing or saying something that made her uncomfortable was at Yankovic's birthday when A.D. was nine years old. A.D., Yankovic, and Wilk were fishing, and Wilk began to rub A.D.'s back. When they got back from the lake that day, Wilk's sister Kayla told A.D. that Wilk had told Kayla he was in love with A.D. A.D. testified that after that, Wilk was always "touchy-feely" towards her and would often try to get her alone.

{¶ 7} A.D. also testified about a trip to Kalahari Resort in late May 2016 for Patton's birthday. A.D., Yankovic, their other close friend K.P., A.D.'s sister, Patton, Yankovic's half-sister Stephanie, and Stephanie's boyfriend all went on this trip together. The night before they left for Kalahari, A.D. and K.P. spent the night at Yankovic's house and slept in her bedroom. A.D. testified that while they were watching a movie in the living room, Wilk rubbed her thigh when no one was looking.

{¶ 8} A.D. testified that the group stayed in a house at Kalahari. A.D. testified that after spending time at Kalahari, she returned to Cleveland with Wilk and K.P. to pick up Patton's birthday cake and some things from their house to bring back to Kalahari. A.D. testified that Wilk asked her to sit in the front seat on the drive back to Cleveland and held her hand on the way back.

{¶ 9} A.D. testified that they returned to Kalahari later than expected, and everyone else was asleep when they got back. Wilk came into the room that A.D. was sharing with K.P. and laid in bed with A.D. and rubbed her stomach. A.D. testified that K.P. was awake at the time, but A.D. did not know if K.P. saw Wilk

rubbing her because his hand was under the covers.  A.D. testified that when Wilk began to move his hand under her shirt, she grabbed his hand and attempted to stop him, but he continued to rub her under her shirt.

{¶ 10}  A.D. testified that all of this touching made her feel uncomfortable, but Wilk communicated with her through Snapchat messages that everything was okay.  She also testified that Wilk told her not to tell anyone because she would get in trouble and she would no longer be able to be friends with Yankovic.  A.D. explained that she was afraid to tell Yankovic because it would ruin their friendship and because she knew that Yankovic would tell other people.  A.D. stated that she thought about telling her grandmother what was happening but was scared of how people would react to her.

{¶ 11}  The next night, when the group got home to Cleveland from Kalahari, A.D. testified that the group watched a movie in Yankovic's living room.  She fell asleep on the floor with another friend, and she woke up later to Wilk vaginally raping her.

{¶ 12}  A.D. testified that after Wilk raped her, she felt guilty and sick, and she wanted to tell her grandmother but did not know what she would say.  She also testified that she discussed how she felt with Wilk, but she was confused, stating:

> I didn't really — I didn't really know, like, what was going on between us because our families were so close that he even seemed like family to me.  So I don't know.  It was very confusing, but he would always say that everything's gonna be okay, not to tell anybody, and this is just between us.

A.D. also testified that she trusted Wilk. A.D. testified that this contact continued whenever she spent the night at Yankovic's house, and she tried to get Yankovic to spend the night at her house but Yankovic did not want to.

{¶ 13} A.D. also testified about other specific instances. At one point in the fall of 2017, Wilk came to pick her up from her grandmother's house in his white van and digitally penetrated and vaginally raped her in the van. A.D. stated that while this was happening, Patton and Stephanie were both calling Wilk repeatedly. When he finally answered, they asked Wilk where he was and who he was with, and he lied and said that he was driving on the highway. After this incident, A.D. described Patton getting upset and suspicious and smelling A.D.'s clothes.

{¶ 14} A.D. also described multiple instances of Wilk digitally penetrating her when she was living at her grandmother's house in 2017, when she was in eighth grade. Finally, A.D. testified that later in 2017, Wilk snuck into her bedroom and anally raped her. A.D. testified that the last time Wilk raped her was when she was 14 years old.

{¶ 15} A.D. testified that afterwards, she never planned to tell anyone what Wilk had done. Eventually, in 2018, A.D. told her mother, who took her to the police station. A.D. explained that since coming forward about what Wilk had done, she became depressed, she was transferred to a different school, and she lost many friends.

{¶ 16} The state also called A.D.'s mother, B.T. B.T. testified that she met Patton and her family when A.D. was six years old, and the families became very

close and looked at each other as family. B.T. testified that when A.D. turned 16, she wanted her to go on birth control and asked A.D. if she was sexually active. A.D. initially said that she was not, but ultimately told B.T. that Wilk had raped her.

{¶ 17} K.P. testified that she met A.D. and Yankovic when they were in sixth grade and they had been best friends since then. K.P. testified that she would often spend the night at Yankovic's house and that Yankovic's "brother," Wilk, also lived there. K.P. testified that Wilk was always welcoming and would often drive the girls around and buy them food.

{¶ 18} K.P. testified that Wilk would hug her and sometimes touch her hands and her inner thighs. K.P. testified that initially, this contact made her uncomfortable, but did not seem "that bad."

{¶ 19} K.P. also testified about the trip to Kalahari for Patton's birthday. K.P. testified that she had fallen off a ride and scraped her knee, and later that night, Wilk massaged her knee and thigh. K.P. testified that this made her uncomfortable, but she let him keep massaging her because she did not want him to get upset. K.P. testified that the day they returned to Cleveland from Kalahari, the group was watching a movie in Yankovic's living room, and Wilk sat in a recliner with her and pushed himself up against her after she fell asleep. K.P. said that she fell asleep before she knew what was happening, but Wilk messaged her the next day and told her that he had done this. K.P. testified that this made her feel strange, and that she worried about Yankovic finding out because Yankovic would get upset.

{¶ 20} K.P. described an incident when she was 13 years old. The night before the group planned to go to the zoo, Yankovic and A.D. slept at A.D.'s house, and because B.T. did not want more people spending the night, K.P. and another friend slept at Yankovic's house. That night, Wilk kissed K.P. on the couch. K.P. testified that because Yankovic and Patton had short tempers, she feared what would happen if Yankovic learned what had happened. K.P. testified that Wilk subsequently messaged her and threatened that if anyone found out that they had kissed, she would not see Yankovic again.

{¶ 21} K.P. went on to testify about another incident in which she spent the night at Yankovic's house and slept on the couch. Wilk came downstairs to the couch and laid on top of her, kissing her and touching her breasts and her butt and rubbing his erect penis on her. On a separate incident, Wilk digitally penetrated K.P. and she pushed his hand away. Finally, at another point, Wilk was kissing K.P. in the kitchen when Patton came downstairs. Wilk immediately went down to the basement, and Patton got mad, asked what they were doing, and started yelling at K.P. K.P. testified that after this incident, Yankovic was mad at her, and K.P. did not go over to their house for several weeks.

{¶ 22} K.P. testified that A.D. was the first person she told about what Wilk had done. K.P. was spending the night with A.D. at her grandmother's house and confided in her, at which point A.D. responded that the same thing had happened to her. K.P. did not tell anyone else what had happened, but eventually, Patton began leaving K.P.'s mother angry voicemails in which she accused K.P., A.D., and

another friend of doing inappropriate things. Ultimately, a school counselor questioned K.P., and she explained what had happened and was interviewed by police in connection with this case.

{¶ 23} K.P. described feeling numb after the interview. She also explained that she had to transfer schools because everyone at school knew what had happened. K.P. testified that when people initially found out what had happened, Yankovic came to her house and tried to fight her. K.P. explained that she no longer has a relationship with Yankovic.

{¶ 24} Cleveland police officer Michael Farley ("Officer Farley") testified that B.T. and A.D. came in to the station to report a rape on February 12, 2019. Officer Farley testified that B.T. appeared stressed and A.D. was hesitant and seemed afraid to talk to him. Officer Farley testified that the general protocol for an interview like this was for a female officer to conduct the interview, but because no female officer was available, he interviewed A.D. himself. He described getting basic information from A.D., including Wilk's name, and testified that she did not remember all of the specific locations where various instances of rape occurred because it had gone on for a while. Officer Farley testified that he completed a report after the interview and the case was transferred to the sex crimes unit.

{¶ 25} Cleveland police detective Richard Tusing ("Detective Tusing") testified that he had previously worked in the sex crimes and child abuse unit. Detective Tusing testified that in his experience with child victims of sex crimes, reporting by the victims was often delayed, and the crimes often took place over a

span of time. Detective Tusing also testified that based on his experience, the majority of sex crimes against children are committed by someone the child knows. He went on to describe what is known as grooming, stating:

> The majority of them, there is terminology called grooming where they don't initially start off with any kind of sexual assault, where they gain a lot of trust with the child as far as purchasing them items, giving them hugs, you know. And then the hugs become more prolonged and then little inappropriate touching but never anything extreme.

{¶ 26} Detective Tusing stated that he received this case in 2019 and based on the report, he was able to confirm Wilk's name, address, and date of birth on October 3, 1993. Detective Tusing went on to contact B.T. and to reach out to the Cuyahoga County Division of Children and Family Services ("CCDCFS").

{¶ 27} Michael Bokmiller ("Bokmiller"), a CCDCFS supervisor who focuses on forensic interviewing in sexual abuse investigations, testified at length about grooming and the reasons that victims of child sexual abuse may delay reporting the crimes. Bokmiller also testified about the process of forensic interviewing, explaining that it involves developing a rapport with the child by talking about something other than the allegations, and then asking as many open-ended questions as it takes to encourage the child to provide their story without interruption. Bokmiller also described that it was not unusual for the person being interviewed to disclose additional information that they did not disclose in an initial interview at a later point in time. With respect to children who have been victimized over a period of time, Bokmiller explained that he generally tries to focus on finding out what they remember about the first incident and the last incident. Bokmiller

explained that while CCDCFS and law enforcement serve different purposes, they often work in conjunction in investigations to make sure that victims are not interviewed multiple times by multiple different people. In connection with this case, Bokmiller and Detective Tusing worked together to interview A.D. and K.P.

{¶ 28} Detective Tusing described A.D. as composed but reluctant to talk during her interview; he testified that A.D. described interactions with Wilk that constituted criminal conduct. A.D. told Detective Tusing that most of the incidents with Wilk occurred at Yankovic's house, and she provided the names of everyone who was usually at the house. Detective Tusing subsequently interviewed A.D's younger sister and another friend who A.D. had said was present during some of the incidents she described. Detective Tusing testified that both of these interviews corroborated the general nature of A.D.'s story, but neither referred to specific criminal conduct. Bokmiller and Detective Tusing testified that they attempted to interview Yankovic as well, but when they reached out to Patton to set up an interview, Patton told them to contact her attorney.

{¶ 29} Detective Tusing testified that based on A.D.'s interview, he learned that she communicated with Wilk through Snapchat and Facebook Messenger. Detective Tusing copied messages from A.D.'s Facebook account. Because of the nature of Snapchat communications that are deleted shortly after being viewed by the recipient, Detective Tusing was unable to recover any of these messages.

{¶ 30} Detective Tusing subsequently reached out to K.P.'s parents, and K.P.'s father brought her to be interviewed. Detective Tusing testified that K.P.'s

father had no firsthand knowledge about this case and appeared calm but angry. Detective Tusing testified that K.P. was extremely reluctant to talk. Bokmiller described K.P. as stressed because of threats she was receiving from Patton. Ultimately, K.P. corroborated much of the general information provided by A.D. and described separate instances that Detective Tusing characterized as criminal conduct.

{¶ 31} Following these interviews, Detective Tusing consulted with a city prosecutor and issued a warrant for Wilk's arrest. Wilk was subsequently arrested and his cellphone was seized. Detective Tusing testified that he asked Wilk if he would provide a statement and Wilk declined.

{¶ 32} At the close of the state's case, the state moved to amend the indictments to reflect names, dates, places, and specific kinds of sexual conduct that conformed with testimony from A.D. and K.P. Wilk did not object, and the court allowed the amendments pursuant to Crim.R. 7(D). Wilk's counsel made a Crim.R. 29 motion for acquittal. The court denied Wilk's motion.

{¶ 33} Wilk called numerous witnesses on his behalf. Yankovic testified that she and Wilk are not biologically related, but Wilk was related to Yankovic's half-sister Stephanie and Yankovic considered him an older brother. Yankovic testified that Wilk provided financial support to her family. Yankovic testified that she lived next door to A.D. and had known her since they were approximately six years old, and she met K.P. in sixth grade, and the three girls were very close. Yankovic testified that A.D. and K.P. spent a lot of time at Yankovic's house, but she

stated that Wilk rarely spent time with them outside of birthday parties or other family celebrations.

{¶ 34} Yankovic testified that her friendship with A.D. and K.P. ended after a falling out over a mutual friend. She denied that the allegations in this case caused the end of her friendship with A.D. and K.P., and she testified that she was completely surprised to learn of the allegations against Wilk.

{¶ 35} Stephanie testified that Wilk was her half-brother, they had the same father, and she had known Wilk since she was approximately 10 or 11 years old.[1] Stephanie testified that she knew A.D. and K.P., and she sometimes babysat Yankovic, A.D., and A.D.'s younger sister. Stephanie testified that Wilk came to live with her family when she was 11 years old because he had nowhere to go. She went on to testify that since then, Wilk supported her mother, Patton.

{¶ 36} Stephanie's testimony largely mirrored Yankovic's; she testified that A.D. and K.P. often spent the night at their house and that while Wilk was also at the house, she did not see him interact with the girls individually. Stephanie also testified that she was surprised to learn about the allegations against Wilk.

{¶ 37} Daniel Ortiz ("Ortiz") testified that he was friends with Wilk and has known him since Ortiz was in fourth grade. Ortiz also testified that Yankovic was his girlfriend and coworker. Ortiz testified that Wilk was a caring and hardworking

---

[1] Stephanie was 22 years old at the time of the trial in this case.

man, and with respect to the allegations in this case, Ortiz did not think that Wilk was the kind of person who could have done something like this.

{¶ 38} Duren Wey ("Wey") testified that he knew Wilk through Wilk's mother, and Wilk helped him move some heavy items and do some work around his house. Wey testified that for a period of time in 2020 when Patton and Wilk were going to be homeless, he let them live with him. Finally, Wey testified that he had never seen Wilk behave inappropriately.

{¶ 39} Wilk's sister Kayla also testified. Kayla testified that in 2016, she lived with Wilk, Patton, Stephanie, and Kristalyn. Kayla testified that Kristalyn's friends often spent the night, but she never saw any of them alone with Wilk, and she never observed him behaving inappropriately with any of the girls.

{¶ 40} Arman Edwards ("Edwards") testified that he met Wilk in 2011 through Kayla because they were previously in a relationship; Edwards and Kayla have three children together. Edwards testified that he considered Wilk a brother and thought of him as hardworking. Edwards also testified that on various occasions, he spent time at Patton's house with Wilk, Yankovic, Kayla, and various friends and family.

{¶ 41} Finally, Patton testified that she lived in Cleveland with Wilk, Yankovic, and Ortiz. Patton testified that she has known Wilk since he was six years old. Patton testified that Wilk was her best friend, they had lived together for 11 years, they had fallen in love, and had discussed getting married. Patton testified that Yankovic, A.D., and K.P. were very close friends, and Patton considered herself

a mother to all of them. Patton testified that she never observed anything inappropriate between Wilk and any of the girls.

{¶ 42} In the state's cross-examination of each of Wilk's witnesses, the state asked the witnesses, over defense counsel's objections, whether they knew that Wilk had been adjudicated delinquent for raping a five-year-old girl, and, if they had known, if that would change their opinion of Wilk. Following Patton's testimony, the defense rested.

{¶ 43} The court instructed the jury, in relevant part: "Now, evidence was received of prior acts of the defendant as well as information contained on a cell phone. This evidence was received only for a limited purpose and that was to test the extent and depth of knowledge about the defendant that was possessed by the witnesses."

{¶ 44} On July 7, 2021, the jury found Wilk guilty of all charges.

{¶ 45} On July 12, 2021, the court held a hearing on the sexually violent predator specifications. The state called E.C., who testified that Wilk was her cousin's half-brother who often babysat her when she was a child. E.C. testified that when she was a child, she liked cats, and Wilk told her that she would get a cat if she touched his penis. In 2004, when E.C. was five years old, her mom came into her bedroom and caught Wilk vaginally raping her. E.C. identified Wilk at trial.

{¶ 46} The state also called Robin Palmer ("Palmer"), a former supervisor at a mental health agency that worked with the Ohio Department of Youth Services to conduct sex offender evaluations and victim trauma assessments. Palmer

testified that in her former capacity as a supervisor, she performed assessments of Wilk as a result of his being found delinquent for a sexual offense. Palmer first conducted an assessment of Wilk in 2007, after he was found delinquent of a sexual offense against five-year-old E.C. Palmer testified that five risk factors applied to Wilk, including having an attitude supportive of reoffending and having difficulty with anger management. She conducted a second assessment in 2009, after Wilk was found delinquent of a separate sexual offense against a girl from the time she was five years old until she was eight years old. Palmer testified that the second assessment led her to conclude that seven risk factors applied to Wilk, putting him at a "medium" risk for reoffending.

{¶ 47} Based on the evidence presented at this hearing, the court found Wilk guilty of being a sexually violent predator.

{¶ 48} On July 29, 2021, the court held a sentencing hearing. Defense counsel addressed the court and requested the minimum sentence on each count. A family member of Wilk's addressed the court on his behalf. The state addressed the court and read a letter from A.D. into the record. The state also stated that it believed Counts 3 and 4 and Counts 6 and 7 would merge and would elect to have Wilk sentenced on Counts 3 and 6. Wilk also addressed the court.

{¶ 49} The court ultimately sentenced Wilk to life imprisonment with parole eligibility after 10 years each on Counts 1, 2, 3, 5, and 6. The court also sentenced Wilk to six months each on Counts 8, 9, and 10. The court ordered the sentences to be served consecutively.

{¶ 50} Wilk appeals, presenting six assignments of error for our review:

I. The trial court erred in allowing evidence of unduly prejudicial testimony of the Appellant's character which was not connected to or relevant to the crimes for which Appellant was on trial in violation of Ohio Evid.R. 401-404, the Ohio Constitution, and the Fourteenth Amendment of the United States Constitution.

II. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charges, and thereafter entering a judgment of conviction of those offenses as those charges were not supported by sufficient evidence, in violation of defendant's right to due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

III. Appellant's convictions are against the manifest weight of the evidence.

IV. The trial court erred by ordering convictions and a separate sentence for separate counts because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

V. The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

VI. The trial court erred by imposing an indefinite prison sentence upon Appellant which is unconstitutional.

**Legal Analysis**

**I. Evidence**

{¶ 51} In Wilk's first assignment of error, he argues that the court abused its discretion when it permitted the state to repeatedly cross-examine defense witnesses about Wilk's juvenile adjudication for sexual offenses, over defense counsel's objection.  Wilk argues that these instances during cross-examination violated Evid.R. 401 through 404 and deprived him of a fair trial.

{¶ 52} The decision whether to admit or exclude evidence is subject to review under an abuse of discretion standard, and reviewing courts will not disturb evidentiary rulings absent a clear showing that the trial court abused its discretion and materially prejudiced a party. *State v. Barnes*, 8th Dist. Cuyahoga No. 104045, 2017-Ohio-383, ¶ 17, citing *State v. Lyles*, 42 Ohio St.3d 98, 99, 537 N.E.2d 221 (1989).

{¶ 53} Wilk is generally correct that the Rules of Evidence prohibit the use of character evidence to show that an accused has the propensity to commit the crime with which they stand charged. *State v. Rosas*, 8th Dist. Cuyahoga No. 109952, 2021-Ohio-3677, ¶ 54, citing *State v. Thompson*, 66 Ohio St.2d 496, 497, 422 N.E.2d 855 (1981). However, "it is well established that once an accused puts evidence of a pertinent character trait in issue, the prosecution may offer evidence to rebut the accused's character evidence." *Id.*, citing Evid.R. 404(A)(1). Evid.R. 404(A)(1) provides:

> Evidence of a pertinent trait of [the accused's] character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided for by statute enacted by the General Assembly are applicable.[2]

Therefore, pursuant to Evid.R. 404(A)(1), a criminal defendant may choose to "'offer evidence of his [or her] good character as proof that he [or she] did not commit the act charged because such conduct is not in accord with his [or her]

---

[2] The exceptions referred to in Evid.R. 404(A)(1) are inapplicable to this case.

character.'" *Rosas* at ¶ 56, quoting *State v. Danzy*, 8th Dist. Cuyahoga No. 109433, 2021-Ohio-1483, ¶ 37, citing Gianelli, *Gianelli Snyder Evidence* at 229 (1996).

{¶ 54} Each of the witnesses Wilk called on his behalf testified on direct examination that they were surprised by the allegations in this case because they did not believe Wilk to be the kind of person capable of this conduct. Because Wilk elected to present evidence of his own good character pursuant to Evid.R. 404(A)(1), Evid.R. 405 was implicated and allowed the prosecution to offer evidence of the bad character of the accused. *Rosas* at ¶ 57. Evid.R. 405(A) provides:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Thus, by introducing evidence of his own good character, Wilk "opened the door" for the state to rebut or impeach that character evidence on cross-examination. *Rosas* at ¶ 59, citing *Danzy*, 8th Dist. Cuyahoga No. 109433, 2021-Ohio-1483, ¶ 37, and *State v. Salyers*, 3d Dist. Allen No. 1-19-17, 2020-Ohio-147. The state was permitted to rebut Wilk's character evidence with evidence showing that Wilk "was indeed capable of engaging in the conduct for which he was presently accused." *Id.* Specifically:

> A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness — not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony.

*Id.* at ¶ 60, quoting *State v. Elliott*, 25 Ohio St.2d 249, 267 N.E.2d 806 (1971). Further, although juvenile adjudications are generally inadmissible tools of impeachment pursuant to Evid.R. 609(D), there are certain instances in which juvenile adjudications may be introduced. *State v. Blaze*, 8th Dist. Cuyahoga No. 44165, 1982 Ohio App. LEXIS 11964, 13 (June 3, 1982). Specifically relevant to this case, evidence of prior juvenile is admissible "on cross-examination of defendant's character witnesses or in rebuttal where defendant introduces character evidence that defendant had not previously been in trouble." *State v. Hilty*, 11th Dist. Trumbull No. 89-T-4204, 1990 Ohio App. LEXIS 4509, 6 (Oct. 19, 1990), citing *State v. Hale*, 21 Ohio App.2d 207, 215, 256 N.E.2d 239 (10th Dist.1969). Therefore, the state's cross-examination of Wilk's character witnesses did not violate the Rules of Evidence.

{¶ 55} Further, we note that the record reflects that immediately before Wilk presented his case, the court specifically instructed defense counsel on this issue, noting that if Wilk's witnesses testified as to Wilk's reputation, it would open up the possibility of cross-examination related to Wilk's prior offenses. Because the state's cross-examination of Wilk's character witnesses was proper according to Evid.R. 405(A), the trial court did not abuse its discretion in permitting it. Therefore, Wilk's first assignment of error is overruled.

**II. Sufficiency of the Evidence**

{¶ 56} In his second assignment of error, Wilk argues that the court improperly denied his Crim.R. 29 motion to dismiss the charges. Specifically, Wilk

argues that it is improbable that neither victim, nor anyone else present during some of the relevant conduct in this case, was aware that the alleged conduct was occurring.

{¶ 57} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 58} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 59} Wilk's argument does not direct this court's attention to any element of any offense for which the state failed to present sufficient evidence. Having

reviewed the record in its entirety, and viewing the evidence in the light most favorable to the state, we conclude that any rational trier of fact could have found the elements of rape, gross sexual imposition, and unlawful sexual conduct with a minor were proven beyond a reasonable doubt. Wilk's second assignment of error is overruled.

### III. Manifest Weight of the Evidence

{¶ 60} In his third assignment of error, Wilk argues that his convictions are against the manifest weight of the evidence. Unlike a challenge to the sufficiency of the evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins* at 387.

{¶ 61} Although we consider credibility when reviewing a manifest weight challenge, "issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact." *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982), and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Further, the trier of fact is free to believe all, part, or none of the

testimony of each witness. *Id.*, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992). Therefore, appellate courts will generally defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor. *Id.*, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶ 62} Wilk argues that there is no independent corroborative evidence that he engaged in any sexual acts with either victim. Wilk also emphasizes the complete lack of physical evidence in this case. These arguments are unpersuasive.

{¶ 63} This court has repeatedly held that the absence of corroborative evidence does not render a rape conviction against the manifest weight of the evidence. *State v. Frazier*, 8th Dist. Cuyahoga No. 107680, 2019-Ohio-2739, ¶ 34, citing *State v. Hruby*, 8th Dist. Cuyahoga No. 81303, 2003-Ohio-746, ¶ 12. Furthermore, the state presented evidence at trial in the form of testimony from Bokmiller and Detective Tusing that in child sex abuse cases, an absence of physical evidence is common due to the delayed reporting that is typical of child victims. Finally, we note that while A.D. and K.P. did not corroborate each other's testimony with respect to Wilk's sexual conduct, their testimony was generally corroborative.

{¶ 64} Having reviewed the entire record, we cannot conclude that the jury court clearly lost its way and created a manifest miscarriage of justice. Wilk's convictions were not against the manifest weight of the evidence. Therefore, Wilk's third assignment of error is overruled.

**IV. Merger**

{¶ 65} In Wilk's fourth assignment of error, he argues that the trial court erred by failing to make a proper determination as to whether his offenses were allied offenses of similar import pursuant to R.C. 2941.25. Wilk acknowledges that some of his offenses were merged for sentencing — specifically, Counts 3 and 4 and Counts 6 and 7 — but he does not articulate which additional offenses should have been merged for sentencing.

{¶ 66} Our review of the record shows that the state presented its merger analysis to the court at sentencing as outlined above, and Wilk did not object to this analysis or otherwise present a different merger analysis. An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. Additionally, the Ohio Supreme Court has held that a trial court does not have a duty to inquire about allied offenses if the defense fails to raise the issue at sentencing. *Id.* at ¶ 6.

{¶ 67} Plain error is that which affects the outcome of the proceedings. *Rogers* at ¶ 22, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2001). It should only be found in exceptional circumstances and to prevent a miscarriage of justice. *State v. Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 82, citing *State v. Landrum*, 53 Ohio St.3d 107, 110, 559 N.E.2d 710 (1990). To demonstrate plain error regarding the failure to merge allied offenses, "an accused has the burden to demonstrate a reasonable probability that

the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus." *Id.*, quoting *Rogers* at ¶ 3.

{¶ 68} Wilk has not satisfied that burden here. While Wilk articulates the standard for determining whether offenses are allied offenses of similar import, we reiterate that he does not articulate which of his numerous offenses should have merged with which other of his offenses, let alone provide a rationale as to why. A review of the offenses for which Wilk was sentenced show that they were all committed either on different dates or against different victims, both of which would preclude them from being subject to merger. *State v. Locke*, 8th Dist. Cuyahoga No. 102371, 2015-Ohio-3349, ¶ 24, citing *State v. Liuzzo*, 8th Dist. Cuyahoga No. 99545, 2013-Ohio-5028 ("Where the defendant is charged with conduct occurring on different dates, the offenses are not allied on the face of the indictment."); *State v. Chaney*, 8th Dist. Cuyahoga No. 97872, 2012-Ohio-4933, ¶ 26 ("Where a defendant commits the same offense against different victims during the same course of conduct, a separate animus exists for each victim such that the offenses are not allied."). Finally, Counts 8, 9, and 10 were all committed against the same victim — K.P. — but each involved a different sexual act. Separate sexual acts are separate and distinct crimes and are not allied offenses. *State v. McSwain*, 8th Dist. Cuyahoga No. 105451, 2017-Ohio-8489, ¶ 45, citing *State v. Nicholas*, 66 Ohio St.3d 431, 435, 613 N.E.2d 225 (1993).

{¶ 69} Based on the foregoing, Wilk has not satisfied his burden of demonstrating a reasonable probability that any of his convictions were allied

offenses of similar import.  Therefore, we decline to find plain error.  Wilk's fourth assignment of error is overruled.

**V. Consecutive Sentences**

{¶ 70} In his fifth assignment of error, Wilk argues that the court erred by imposing consecutive sentences without making the required findings pursuant to R.C. 2929.14(C).

{¶ 71} The trial court did not impose consecutive sentences pursuant to R.C. 2929.14(C); rather, the trial court sentenced Wilk pursuant to R.C. 2971.03, which specifically governs the sentencing of sexually violent offenders with predator specifications.  The court specifically referenced R.C. 2971.03 at the sentencing hearing, and Wilk did not object to its application.

{¶ 72} Wilk was convicted of a sexually violent predator specification, a sexually violent offense — rape, in violation of R.C. 2907.02(A)(2) — and a sexually oriented offense — gross sexual imposition, in violation of R.C. 2907.05(A)(1). Therefore, Wilk was sentenced pursuant to R.C. 2971.03 as a sexually violent predator.

{¶ 73} R.C. 2971.03 states, in relevant part:

(A) [T]he court shall impose a sentence upon a person who is convicted of or pleads guilty to a violent sex offense and who also is convicted of or pleads guilty to a sexually violent predator specification that was included in the indictment * * * as follows:

* * *

(3)(d) Except as otherwise provided in division (A)(4) of this section, if the offense for which the sentence is being imposed is rape for which a term of life imprisonment is not imposed under division (A)(2) of this

section or division (B) of section 2907.02 of the Revised Code, it shall impose an indefinite prison term as follows:

* * *

(ii) If the rape is committed prior to January 2, 2007, or the rape is committed on or after January 2, 2007, other than in violation of division (A)(1)(b) of section 2907.02 of the Revised Code, it shall impose an indefinite prison term consisting of a minimum term fixed by the court that is not less than ten years, and a maximum term of life imprisonment.

Therefore, the court properly sentenced Wilk to life sentences with parole eligibility after ten years on the rape offenses — Counts 1, 2, 3, 5, and 6.

{¶ 74} Further, R.C. 2971.03(E) states:

If the offender is convicted of or pleads guilty to two or more offenses for which a prison term or term of life imprisonment without parole is required to be imposed pursuant to division (A) of this section, divisions (A) to (D) of this section shall be applied for each offense. All minimum terms imposed upon the offender pursuant to division (A)(3) or (B) of this section for those offenses shall be aggregated and served consecutively, as if they were a single minimum term imposed under that section.

Therefore, the court was required to run each of Wilk's rape sentences consecutively. *State v. Garner*, 8th Dist. Cuyahoga No. 106933, 2019-Ohio-250, ¶ 5; *State v. Henderson*, 11th Dist. Geauga No. 2008-G-2867, 2009-Ohio-5207, ¶ 15. This requirement exists independently of the consecutive sentencing statute in R.C. 2929.14. *Id.* at ¶ 7. Therefore, we find that the trial court properly imposed consecutive sentences on Wilk's rape convictions as it was required to do pursuant to R.C. 2971.03.

{¶ 75} The court also sentenced Wilk on three counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1) – Counts 8, 9, and 10. Pursuant to

R.C. 2929.14(A)(4), the court imposed a sentence of six months on each count of gross sexual imposition. While R.C. 2971.03 governs Wilk's sentence, it does not provide explicit guidance as to whether sentences imposed under R.C. 2929.14(A) shall be consecutive or concurrent.

{¶ 76} The state refers to R.C. 2971.03(D) in support of its argument that sentences imposed pursuant to R.C. 2929.14 must be served consecutively to those imposed pursuant to R.C. 2971.03(A). R.C. 2971.03(A) provides that

> [i]f a court sentences an offender to a prison term of life imprisonment without parole pursuant to division (A) of this section and the court also imposes on the offender one or more additional prison terms pursuant to division (B) of section 2929.14 of the Revised Code, all of the additional prison terms shall be served consecutively with, and prior to, the prison term or term of life imprisonment without parole imposed upon the offender pursuant to division (A) of this section.

The "additional prison terms" imposed pursuant to R.C. 2929.14(B) refer to firearm specifications. While Wilk was sentenced pursuant to R.C. 2929.14(A), he was not charged with, convicted of, or sentenced on a firearm specification pursuant to R.C. 2929.14(B). Therefore, we are not convinced by the state's argument that R.C. 2971.03(A) requires the court to order Wilk's gross sexual imposition sentences to be served consecutively to his rape sentences.

{¶ 77} Moreover, the state concedes that there is an alternative interpretation of the statute that would permit the court to run Wilk's gross sexual imposition sentences concurrent to each other but consecutive to his rape sentences imposed under R.C. 2971.03(A). In the absence of clear language in R.C. 2971.03 requiring the court to order Wilk's gross sexual imposition sentences be served

consecutively, we find that the court could not have imposed consecutive sentences on Counts 8, 9, and 10 without making consecutive-sentence findings under R.C. 2929.14(C). Therefore, we vacate the sentences imposed on Counts 8, 9, and 10 and remand for the limited purpose of allowing the trial court to either make the requisite consecutive-sentence findings under R.C. 2929.14(C) or impose concurrent sentences on those counts. Wilk's fifth assignment of error is sustained.

## VI. Reagan Tokes

{¶ 78} In his sixth and final assignment of error, Wilk argues that the trial court erred by imposing an indefinite sentence pursuant to Reagan Tokes, enacted under S.B. 201 and R.C. 2901.011. While the court did impose an indefinite sentence on Wilk for his rape offenses, the sentence was not imposed pursuant to Reagan Tokes. As discussed above, the trial court sentenced Wilk pursuant to R.C. 2971.03. Further, the Reagan Tokes Law applies to crimes committed on or after March 22, 2019. *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 128 (8th Dist.). Wilk's offenses occurred over the span of several years, most recently in 2017; therefore, Reagan Tokes is inapplicable to Wilk's case. Wilk's sixth assignment of error is overruled.

{¶ 79} Judgment affirmed in part, vacated in part, and remanded for the limited purpose of resentencing on Counts 8, 9, and 10 in accordance with this opinion.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR